**LA CROSSE GARMENT MANUFAC-
TURING CO.**
v.
**The UNITED STATES.**
No. 85–68.

United States Court of Claims.
Oct. 16, 1970.

Samuel F. Schwag, Philadelphia, Pa., attorney of record, for plaintiff.

Peter J. P. Brickfield, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on June 5, 1970, wherein such facts as are necessary to the opinion are set forth. On August 5, 1970, defendant filed a motion requesting that the court adopt the commissioner's report in which motion defendant has stated as follows: "Plaintiff has advised the Clerk of the Court, in a letter dated June 26, 1970, that 'Plaintiff does not seek review pursuant to Rule 50(b) (3), * * *'." On September 2, 1970, the plaintiff filed a motion requesting that the court adopt the commissioner's report and issue judgment based thereon. Therefore, the case has been submitted to the court on the report, opinion and recommended conclusion of the trial commissioner and the defendant's motion for adoption without oral argument. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted in part, defendant's cross-motion is correspondingly denied, and partial summary judgment is entered that plaintiff is entitled to recover on its claims numbered II and III in this opinion, and that further proceedings are stayed pursuant to Rule 167 with which plaintiff shall comply, for a period of 120 days pending an administrative determination of the equitable adjustment to which plaintiff is entitled. Plaintiff is not entitled to recover on any other claims in the petition, as to which defendant's cross-motion is allowed, and plaintiff's motion correspondingly denied with the petition dismissed as to such claims.

## OPINION OF COMMISSIONER

SCHWARTZ, Commissioner:

Plaintiff was awarded two contracts in March and December 1963, for the manufacture, from Government-furnished cot-

ton duck, webbing and buckles, of almost 900,000 gas mask carriers called "Carriers Field Protective Mask, M15," for $1.53 each, or a total cost of over $550,-000, exclusive of the value of the furnished materials.

The Government's drawings, a part of the specifications were defective in several respects and were the subject of claims for equitable adjustments, some of which were upheld and some denied by the Armed Services Board of Contract Appeals. Three of the claims denied by the Board are pressed in the present petition, in two counts, in which the petitioner contends that the Board committed reversible errors of fact and of law.

The applicable standards for the determination of the issues, presented by cross-motions for summary judgment, are those of the Wunderlich Act. The Board's findings of fact are final if supported by substantial evidence, and its decisions of questions of law are open to independent judicial consideration. 41 U.S.C. §§ 321, 322. Alternative claims of breach of contract and trial de novo require no consideration. Complete redress was available administratively, under the contract, and suit for breach is consequently barred. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965); L. W. Foster Sportswear Co., Inc. v. United States, 405 F.2d 1285, 1287, 186 Ct.Cl. 499, 502 (1969).

I

One of the inconsistencies in the drawings concerned the gusset for the carrier's side panel which, if the drawings were followed, would have caused the gusset to be overlong in one direction or another. Clarification of the drawing was requested, and did not come. Plaintiff, required to choose between shortening the gusset panel, increasing its hem or feeding the excess material into other parts of the carrier, chose shortening.

Some 42,000 carriers with short gussets were tested, accepted and delivered. At that point, a complaint was received by the Government that the carriers were skimpy, and 130,000 carriers ready for delivery were rejected for short gussets, as contrary to specifications. After some negotiations, plaintiff offered to accept a price reduction of two cents per carrier, a total of $2,600, if the Government would grant a deviation under which the short gussets could be approved. The Government agreed.

The issue is the enforceability of the agreement. It arises on a claim—the first of two in count one—for the $2,600 withheld by the Government. The ground is that the essential fault was that of the specifications, which plaintiff reasonably or correctly interpreted, and that the agreement for the price reduction and the deviation were based upon an offer exacted from plaintiff by duress and made under protest. The Government's defense rests on the written agreement for the reduction, voluntarily signed by plaintiff some months after the offer claimed to have been made under duress. This agreement, plaintiff responds, was obtained by fraud. The Board rejected the contentions of fraud and duress, and enforced the written agreement.

The facts are these:

A conference was held by the parties on October 28, 1963, at Edgewood Arsenal, to discuss the difficulties being encountered by plaintiff, and particularly the problem of the short gussets. When Mr. Bezozo, plaintiff's New York-based contract liaison officer, asked for permission to ship the 130,000 carriers, the chief Government representative present, the contract specialist, responded that if plaintiff requested a deviation accompanied by a two-cent reduction in price per unit, the Government would agree to accept the 130,000 units with the short gussets.

By letter of the following day, Bezozo requested the deviation, but made no mention of a price reduction. In telephone conversations which followed, Mr. Huss, the contracting officer, told Bezozo that plaintiff would have to give the price reduction as consideration for the deviation. Huss testified that though Bezozo

was not happy about the terms, he made no mention of appealing the decision, and left Huss with the impression that the agreement would be unconditional. Mr. Huss in his testimony said that Bezozo "was forced—well, he wanted to accept my terms because he wanted to be able to ship—if he couldn't ship, he couldn't get paid and the company needed the money." It does not appear whether these words were an attempt to restate Bezozo's words or the witness' impression from what Bezozo and perhaps others had told him.

On November 12, 1963, Mr. Bezozo telegraphed the contracting officer, offering the two-cent reduction. The telegram added that "This offer is made under duress and protest since we disagree with the findings. We intend to appeal the decisions and findings reached. We do wish to advise that we are compiling information and data for a claim which we intend to bring in the area of 25,000 dollars." Mr. Huss testified that he did not receive this telegram until after he had talked to and telegraphed Bezozo on the following day, November 13.

On November 13, Bezozo and Huss talked on the telephone, and thereafter Huss sent a telegram to Bezozo agreeing to accept the carriers, as follows: "Confirming our telephone conversation this date * * *. Not more than 130,000 Carriers will be accepted with the short gusset, and acceptance is further conditioned upon your telephonic agreement on 13 November 1963 to reduce the unit price of these 130,000 Carriers by $.02 each. * * * Formal contract modification is being prepared incorporating this agreement."

At a meeting between the two men in the following month, on December 5, Bezozo again broached the subject of the short gusset carriers. He testified that Huss left him with the impression that plaintiff's appeal rights had been fully protected by Bezozo's prior protests.

In January Huss prepared and sent for signature to plaintiff's home office in LaCrosse, Wisconsin, copies of a Supplemental Agreement No. 6 By Article IV of this agreement, the Government accepted the 130,000 carriers with the short gusset. Article V provided that "By reason of Article IV * * * the parties have agreed to a price reduction of two cents ($.02) per Carrier for the acceptance of the 130,000 Carriers." The agreement was signed by a vice-president of plaintiff on January 20, 1964, and by Huss as contracting officer on January 24, 1964.

Huss testified that he noted the reference to duress in Bezozo's telegram of November 12. He said that when he drafted the formal documents in January he "chose to ignore that particular statement because those weren't the terms of my understanding with him. I deliberately ignored that proviso because I felt that that was not what we had agreed upon."

On these facts, the Board held the supplemental agreement to be a voluntary, enforceable "accord and satisfaction of the short gusset price reduction dispute," and, further, that plaintiff had made insufficient proof of economic coercion, compulsion or duress. One member of the Board dissented, briefly stating that "Supplemental Agreement No. 6 does not 'stand alone,' but must be read in conjunction with the reservation on file with the contracting officer," presumably a reference to Bezozo's telegram of November 12.

Plaintiff urges that the contracting officer was guilty of misrepresentation, in sending to plaintiff's home office for signature, after having dealt with plaintiff through Bezozo, who was based in New York, an agreement which recited that the parties had agreed to a price reduction, when in fact Bezozo had not agreed. The implication is that plaintiff's vice-president was misled into believing that Bezozo had unqualifiedly agreed to the price reduction, and that signature was a formality only.

■ Misrepresentation is not so easily proven. The elements of misrepresentation, or deceit, are the making of a false

representation, usually of fact, knowledge of its falsity or other evidence of an intent to deceive by inducing reliance, except in the limited circumstances in which negligent misrepresentation is recognized, and justifiable reliance by the plaintiff to his damage. Bar Ray Products, Inc. v. United States, 340 F.2d 343, 351, n. 14, 167 Ct.Cl. 839, 851, n. 14 (1964); 3 Restatement of Torts § 525 (1938); Harper & James, The Law of Torts § 7.1 (1956). None of these elements of misrepresentation was well-enough proven to warrant a reversal of the Board's decision, whether the decision be deemed one of fact or of the legal standards for proof of misrepresentation.

█ For one thing, it is doubtful whether the draft agreement made a representation that the parties had already agreed. A draft agreement conceivably may contain language so specific as to amount to a representation of fact by the draftsman that the parties had already reached an oral agreement. Ordinarily, however, a statement of agreement in a draft contract, having no status until it is signed, is not a statement of fact that the parties have agreed, but rather a proposal that an agreement be made, which will become a statement of agreement when it is signed. The words of the instant draft were plainly of the nonfactual, proposed variety, contingent on signature: "By reason of Article IV * * * the parties have agreed."

For another thing, there was no proof that the vice-president who signed the modification was misled into believing that Mr. Bezozo had unqualifiedly agreed to such a price reduction as was provided in the draft agreement. The vice-president did not testify. And Bezozo did not testify that he did not see Supplemental Agreement No. 6 before it was signed or did not know of its presence on plaintiff's offices for consideration.

Finally, the requisite intent to defraud was not proven by the mere fact that Huss sent the proposed agreement to plaintiff's office in Wisconsin instead of to Bezozo's office in New York. Mr.

Huss testified that he sent the draft to plaintiff in Wisconsin because that was the home office where agreements were normally handled, and because Bezozo was not an officer of the company authorized to sign such documents. The documents support the testimony in part. Other formal contract modifications were addressed to plaintiff in Wisconsin, without special instructions calling them to the attention of Bezozo. Some of them, however—the bid and modifications Nos. 1 and 11—were signed by Bezozo as plaintiff's authorized agent. While there are several references in the record to the fact that Mr. Bezozo maintained his office in New York, it is not established that Huss had reason to believe that Bezozo could be found only there or that he would not see papers sent to Wisconsin. Huss' telegram to Bezozo of November 13, 1963, was addressed to plaintiff in Wisconsin, to the attention of Bezozo, and, as noted, Bezozo did sign some papers sent to plaintiff in Wisconsin. All in all, the evidence falls far short of requiring a conclusion that the formal agreement was fraudulently sent to Wisconsin to avoid scrutiny or claim of duress by Bezozo.

█ From the foregoing, it follows that the claim of misrepresentation fails, for more than one substantial reason.

█ The claim of duress must also be rejected. At most, it would be supported by a general statement by one of plaintiff's witnesses that plaintiff was in financial straits and by the testimony of the contracting officer that plaintiff was "forced" to accept the price reduction because it needed the money. This is not enough. A party induced by the want of money, to which the defendant has not contributed, to accept a lesser sum than he claims is due is not under legally recognized economic coercion or duress. Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity. Mason v. United States, 84 U.S. (17 Wall.) 67, 21 L.Ed. 564 (1872), aff'g 6 Ct.Cl. 57 (1870); United States v. Bethlehem

Steel Corp., 315 U.S. 289, 301, 62 S.Ct. 581, 86 L.Ed. 855 (1942); Inland Empire Builders, Inc. v. United States, 424 F.2d 1370, 1376–1377, 191 Ct.Cl. 742, 753 (1970); Popham v. United States, 151 Ct.Cl. 502, 506 (1960).

Proof was lacking that the Government wrongfully took advantage of plaintiff's need. So far as appears in the record, the origins of the dispute—the Government's claim to a price reduction on carriers with short gussets—were bona fide. There is no suggestion that the refusal to accept the carriers and the demand for a two-cent reduction in price as the consideration for a deviation were a pretense, made for the purpose of extracting a reduction in price not sincerely believed to be warranted. Mr. Huss felt that his duty required that he obtained a consideration for the Government's agreement to grant a deviation permitting acceptance of carriers with a skimpy, short gusset.

No case has been made out as would overturn the Board's decision that the Supplemental Agreement was voluntary and operated as a complete, enforceable settlement of the question of price reduction.

## II

The second claim in count one is for reimbursement for over $143,000 in increased costs, allegedly incurred as the result of defects in the drawings supplied by the Government and the Government's delays in resolving the difficulties. Only entitlement was litigated before the Board and is now in issue. The claim is rested on the Changes clause; an alternative theory that the drawings are Government-furnished property works no change in result, and is not discussed.

Conflicts and ambiguities in the Govment's drawings, plaintiff contends, made mass production impossible and forced a shutdown of operations for a two-week period while clarification was requested. When clarification was not forthcoming, plaintiff felt required to resume production, although for lack of clarification it was forced to proceed slowly and inefficiently rather than with the speed otherwise possible. The Board held the drawings defective, but denied the claim on the ground of a failure of proof that the defects made it impossible or impracticable to produce the carriers on a mass production basis.

There is no doubt that the drawings contained numbers of what the Board termed "ambiguities and inconsistencies" or "conflicts." The Board held that pocket shoulder straps and gusset panels cut in accordance with the requirements of two drawings would not fit when sewed together as indicated in a third drawing. It further found that a conflict between two other drawings made it impossible accurately to position the carrier waist strap and chape, and that the same drawings were so ambiguous that they could be interpreted as requiring anywhere from five to ten stitches to attach the chape to the waist strap. There was testimony that the contracting officer for the second contract said that the drawings were "pretty horrible," and permitted plaintiff to operate from a sample rather than from the drawings. The decision that the drawings were defective was eminently correct, and is adopted.

Plaintiff requested clarification of the drawings in the early weeks of the contract, in May 1963, during an inspection visit to the factory by the contracting officer's representative for quality control. Plaintiff continued unsuccessfully to seek clarification at meetings with various Government representatives during most of the following year. Mr. Bezozo testified that in his efforts to get clarification of the drawing he made more than 100 telephone calls to Mr. Huss, the contracting officer on the first contract.

Government officers had no greater success. On October 25, 1963, one of the inspectors wrote to Edgewood Arsenal, which apparently became the source of authority over the drawings and specifications: "Throughout this contract there

has been difficulty in obtaining any written answers to our questions." Following a visit to the factory in November 1963, the inspector's immediate superior submitted a report stating, "It became quickly evident, that the lines of communication between the N. Y. Chem Corp. Office and the assigned Gov. representatives left much to be desired. Especially in the area where instructions, verification procedures and changes of any nature were given verbally, and in spite of our continuous efforts to obtain confirmation in writing to any of these instructions and/or changes, none were even written."

In March 1964, plaintiff presented a comprehensive written request for clarifications, enumerating in detail the difficulties it was having with the drawings. According to plaintiff's contract manager, the answers sought never were received. The best the contracting officer could say in rebuttal was that "eventually every inquiry made by the contractor was eventually answered." According to the Board, "discussions about the drawings continued throughout the life of the contract."

■ The Board understated when it spoke of "failures to clarify some of the alleged ambiguities promptly or diligently," and described the cause of the failures as a "lack of effective communication between the Government inspectors, quality control personnel, technical personnel and the contracting officer." Nevertheless, held the Board, while the "lack of information and answers to queries" was "disconcerting" and "the ambiguities caused appellant concern, they did not make it impossible or impracticable to produce the units on a mass production basis." The decision was error.

■ The responsibility of the Government for its specifications and drawings is well recognized. Government contracts are held to contain a warranty that satisfactory performance is possible, if the specifications are followed, and the Government is therefore liable for the increase in costs by reason of defects in the specifications. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953); Hol-Gar Manufacturing Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966). "It is now familiar law that a contractor is entitled to an equitable adjustment under the Changes article for increased costs of performance due to defective specifications." L. W. Foster Sportswear Co., Inc. v. United States, *supra*, 405 F.2d at 1290, 186 Ct.Cl. at 507.

■ The Board erred in the standard it utilized in applying the basic rule of liability. Its error lies primarily in the use of so amorphous a concept as mass production to hold that because mass production was not shown to be impossible, no basis remained for a recognition of increased costs. "Mass production" is a variable; there are countless degrees between the laborious production of units, one at a time, and their rapid flow on an assembly line. *Cf.* Natus Corp. v. United States, 371 F.2d 450, 457, 178 Ct.Cl. 1, 11 (1967). The conclusion that mass production was possible did not foreclose plaintiff's rights.

■ The decisions on interference with large-scale production have not suggested such an unreasonable rule as would limit compensation for the damage flowing from defective drawings to cases of total breakdown in production or to total inability to mass produce. Centre Mfg. Co. v. United States, 392 F.2d 229, 232–233, 183 Ct.Cl. 115, 121–122 (1968); L. W. Foster Sportswear Co., Inc. v. United States, *supra*, 405 F.2d 1289–1290, 186 Ct.Cl. at 505–508. Performance may become unsatisfactory and costs may increase, in varying degrees, by reason of defects in the drawings which cause difficulties, interruptions, slowdowns and delays which interfere with mass production without making it impossible. The measure for determination of damages is therefore the

degree of interference with satisfactory performance.

 Costs incurred by idleness are a compensable extra cost if the source of the idleness or delay is defective drawings. "The defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work and then compensate plaintiff merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors." Laburnum Constr. Corp. v. United States, 325 F.2d 451, 457–458, 163 Ct.Cl. 339, 350 (1963).

 On the foregoing standard, the plaintiff's proof of entitlement was sufficient. There is no doubt that faults in the drawings caused plaintiff difficulties in production. The Board so held, in approving the testimony of plaintiff's expert witness that "It would be possible to mass produce this article, but with some difficulty, which I think could be avoided, had the drawings been more informative." Difficulties in production usually cost money. If even one such difficulty was sufficiently proven, plaintiff should have an opportunity in a proceeding on the issue of quantum to prove its dollar damages.

The Board characterized plaintiff's proof of incurrence of increased costs as not "specific evidence." The opinion refers to a failure of proof that plaintiff was "unduly delayed." It is hard to believe that a contractor has not been "unduly" delayed when numerous substantial defects in the Government's drawings go unresolved, despite constant efforts, for almost the life of the contract, because of a breakdown in communication among the elements of the procurement system charged with responsibility for correcting the defects.

As to the specificity of the evidence, plaintiff with some justification complains that it was reserving its dollar proof for presentation in the quantum proceeding to come, after audit and review by the Government, and that without notice the Board in effect converted an entitlement proceeding into a quantum proceeding. Be that as it may, there is in the record at least specific proof of a stoppage in plaintiff's operations caused by the lack of clarity in the drawings. Proof of other damages can await the proceeding on damages.

At the May 1963 meeting mentioned above, the contracting officer's quality control representative, a Mr. Kramer, agreed to obtain clarification of the drawing ambiguities raised by plaintiff. On this, plaintiff stopped production because it did not wish to risk producing units differing from the contracting officer's interpretation of the drawings. The plant remained shut down for two weeks. Clarifications were not received. Hoping for early replies, but impelled by contract requirements, plaintiff reopened the plant for less than full production.

Plaintiff's production manager testified that he shut down "under the impression that we would get answers back from him [Kramer] very shortly so that it was not a matter of our not going ahead with the contract per se, but a short shutdown until we would get answers." He felt that since he had "always gotten answers in the past very quickly on this type of problem" from other agencies, he "didn't look at it as a long shutdown."

As to the reopening, he testified:

I was not getting reply answers on the problems that were presented to Mr. Kramer. I had to make a decision as to either going ahead and possibly being second guessed and having lots rejected or not producing and facing the possibility of termination.

I felt that at this point that we would get answers shortly. I decided that we must keep our production going just a wee bit on this.

The Board did not question the credibility of the witness; no evidence of any substance pointed to other causes for the shutdown or the resumption. Nevertheless, the Board held that "it is not clear what the primary cause [of the stop-

page] was because operations were resumed even before the sought-after clarifications were obtained." Here is non sequitur, and plain error. That operations were resumed after two weeks does not alter or becloud the cause of the stoppage. The record is plain as to the cause of the stoppage and the reason for the resumption. Obviously, the contractor could not wait indefinitely for clarification. Once it appeared that clarification was delayed, resumption became a matter of necessity.

It is accordingly held that the drawings were defective, that plaintiff has made sufficient proof of damage to establish its entitlement to an equitable adjustment in the amount of such increased costs as may be determined by negotiation or in further proceedings before the Board. Proceedings here will be suspended for this purpose. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

### III

In the second count, plaintiff seeks costs of $4,434.12 allegedly incurred in complying with a Government directive for a fourth stitch in sewing the waist strap to the body of the carrier. It is agreed that the drawing involved specifies that the strap is to be stitched to the body at three places. The dispute is over whether the directive correctly interpreted the drawing as requiring an additional, fourth stitch.

The legend on the drawing reads: "⅛ bar tack or block stitch for attachment of B5–4–1042." (A bar tack is a series of short, sharply zigzag stitches, close together. A block stitch (sometimes called a box stitch or box tack) is stitching in the form of a rectangle.) Three lines radiate from the legend, ending in arrows pointing to the strap at three places. At the points of the first two arrows— one near an O-ring at the upper end of the strap and the other at the middle of the strap—there appear bar tacks. At the third arrow, near the D-ring at what

may be called the lower end of the strap, there are shown a bar tack and a block stitch (actually a double block stitch, stitching in the form of one rectangle inside the other). The block stitch is between the bar tack and the D-ring and occupies all the space between them.

The bar tack and block stitch are bracketed by letters G, indicating a detail view of the area. The detail view, "G G," elsewhere on the drawing, is captioned "Four Rows of Stitches and Three Tie-in Stitches." It shows four unbroken horizontal lines, with a substantial space between the top two and the bottom two, and several (either four or five, not three) intersecting vertical lines.

The question for decision is whether the block stitch pictured in the main drawing is illustrative of the optional block stitch referred to in the legend, or is in itself an absolute requirement, in addition to three optional bar tacks or block stitches. The Government contends that the block stitch is an independent, additional requirement. Plaintiff claims that it is merely a representation of the block stitch permitted, three times, as an optional alternative to a bar tack; that there is no or not enough room between the pictured bar tack and the D-ring to insert a block stitch, without overlapping stitches and weakening the fabric.

The need for clarification on the very question at hand was one of the questions raised by plaintiff at the first, May 1963 meeting with Government representatives. When promised clarification did not come, plaintiff began manufacturing carriers without the fourth, block stitch, relying primarily on its reading of the drawing as providing insufficient space between the third bar tack and the block stitch for the inclusion of a double block stitch.

Over 440,000 carriers of the 475,000 called for by the first contract were produced, without the block stitch, inspected and accepted, and plaintiff had been awarded and begun production on the second contract, when a Government di-

rective, applicable to both contracts, ordered inclusion of the fourth, block stitch. Plaintiff complied, and thereafter filed the claim now under consideration for the work involved in adding the required stitch, in the items remaining under the second contract.

The Board denied the claim, on the ground that the drawing unambiguously required addition of a block stitch as a fourth stitch. The decision, interpreting the specification drawings, is one of law open to independent review in this court. Vann v. United States, 420 F.2d 968, 982, 190 Ct.Cl. 546, 570–571 (1970); United Contractors v. United States, 368 F.2d 585, 602–603, 177 Ct.Cl. 151, 173–174 (1966). On such review, my opinion is that the Board erred.

The pictured block stitch satisfies its apparent purpose of illustrating the double block stitch which the contractor would be permitted to employ as an optional alternative to a bar tack. Under the Government's view, the drawing of the double block stitch simultaneously and without further indication serves a second function as a requirement for a fourth stitch—a block stitch compulsorily to be added to the three stitches of optional type. It is difficulty to square this interpretation with the legend on the main drawing: "bar tack or block stitch." The Government's expert witness admitted that the legend has in subsequent contracts been amended, to remove the option.

As to detail drawing G G, the Government's expert witness, an engineer from Edgewood Arsenal, seems to have testified that it showed where the required block stitch was to be placed. Other Government officers, including an inspector at the plant and the contracting officer for the second contract, interpreted the detail as picturing the optional block stitch permitted by the main drawing. Neither interpretation gives support to the Government's contention. Both interpretations are consistent with plaintiff's contention. If a fourth block stitch were required and compulsory, as the Government contends, there would be no need for the detail to show where it is to go; there is hardly enough room for a block stitch between the bar tack and the D-ring. If the detail merely pictures a block stitch, without making it compulsory, then the detail, consistently with plaintiff's position, concerns a block stitch which may at three points be used instead of a bar tack.

Plaintiff's interpretation finds practical support in testimony that insufficient room had been left between the third bar tack and the D-ring to accommodate the pictured double block stitch without overlapping the block stitch on the bar tack, and thereby weakening and possibly tearing the fabric. The Edgewood Arsenal engineer gave his opinion that ample room was available, but cross-examination revealed that the reference line upon which he based his testimony was incorrectly drawn and had been changed in subsequent drawings. The practicalities further support plaintiff in that no explanation was offered or appears why the drawing should mean, as would be the case under the Government's interpretation, that three stitches could be either a bar tack or a block stitch, at the choice of the contractor, but that a fourth stitch, immediately next to the third and serving no different purpose, was required to be a block stitch, without room for choice.

The Government's contention that the block stitch was an independent requirement of a fourth stitch, and the directive to add it, emanated from the Edgewood Arsenal, whose technical personnel was the source of the drawings found to be defective and of the delays in clarification. According to written memoranda in the record, the inspectors at the plant and the contracting officer for the second contract interpreted the drawing, contrary to the Arsenal engineers, as providing for either a bar tack or a block stitch but not both. When word came in May of 1964 that the Arsenal was about to order that a fourth stitch was required, these officers wrote memoranda stating that they disagreed and that their view had been upheld by the Chic-

ago Procurement District. Plaintiff's interpretation is thus supported by the opinions of some of the responsible Government personnel closely involved with the performance of the contract.

Finally, it is material to the disposition of the claim, made under the second contract only, that before the Government took the position for which it now contends, it had awarded to plaintiff a second contract for 424,000 units, which in turn followed a year of performance under the first contract, during which the Government's officers had inspected and accepted more than 440,000 units without a fourth stitch—over 90 percent of the 475,000 under contract.

 It is concluded, therefore, that the drawing was ambiguous and that plaintiff's interpretation was reasonable; that request for clarification was made and was not answered until the one contract had been all but performed and the second awarded; that the plaintiff's interpretation was concurred in by responsible representatives of the Government, including a contracting officer, and was the basis of plaintiff's performance of the greatest part of the first contract and of its bid on the second contract. That interpretation is therefore entitled to support under the familiar rules favoring a reasonable interpretation by plaintiff of an ambiguous Government-drafted specification (Mountain Home Contractors v. United States, 425 F.2d 1260, 1263, 192 Ct.Cl. 16, 21 (1970); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947)) and favoring the interpretation given a contract by the parties before controversy arose (Embassy Moving & Storage Co. v. United States, 424 F.2d 602, 606, 191 Ct.Cl. 537, 544 (1970); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 630 (1967)).

Accordingly, claim III is upheld. As with claim II, only entitlement was litigated, and so this claim, too, must return to the Board for a determination of the amount due plaintiff.

*Conclusion*

1. The plaintiff's motion for summary judgment is granted in part, defendant's cross-motion is correspondingly denied, and partial summary judgment is entered that plaintiff is entitled to recover on its claims numbered II and III in this opinion, and that further proceedings are stayed pursuant to Rule 167, with which plaintiff shall comply, for a period of 120 days pending an administrative determination of the equitable adjustment to which plaintiff is entitled.

2. The plaintiff is not entitled to recover on any other claims in the petition, as to which defendant's cross-motion is allowed, and plaintiff's motion correspondingly denied, and the petition is dismissed as to such claims.