**OPTIMAL DATA CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 238–86C.**

United States Claims Court.

Aug. 16, 1989.

Donald S. Gresko, Endwell, N.Y., for plaintiff.

John S. Groat, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, Director, and Mary Mitchelson, Asst. Director, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

In this government contract action, plaintiff, Optimal Data Corporation (ODC), seeks review pursuant to the Wunderlich Act, 41 U.S.C. §§ 321–322, of a decision by the Interior Board of Contract Appeals (the Board or IBCA). This action is presently before the court on cross-motions for summary judgment. For the reasons explained herein, plaintiff's motion for summary judgment is denied, and defendant's cross motion is granted.

### Facts[1]

The contract in issue is a task order, level-of-effort, cost-reimbursement agreement. On June 29, 1973, pursuant to Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), the United States Environmental Protection Agency (the EPA) awarded EPA Contract No. 68–02–1369 to the Small Business Administration (the SBA), and the SBA, on that same day, awarded Subcontract No. SB424–8(a)–73–C–261 to plaintiff, which incorporated the EPA contract in its entirety.

---

**1.** The decision of the IBCA describes the background facts in a clear and precise manner. The following statement of facts borrows generously from the IBCA's factual recitation. The facts material to resolution of the cross-motions for summary judgment are not in dispute.

Plaintiff's contract covers "Quick Reaction Engineering and Technical Services" which involves research, analysis, and the preparation of reports concerning the technical and economic feasibility of pollution control processes. Pursuant to the contract terms, work to be performed is delineated in "Contract Task Specification" orders which, when issued, constitute specific work assignments to the contractor.

The contract required the contractor to perform 1,000 technical man-hours of work (plus or minus 10 percent) which was defined in an initial task order.[2] In addition, the contract gave the EPA, during the three-year contract period, the option to issue up to 30 additional task orders, each involving similar services in similar 1,000 technical man-hour units. For each 1,000 man-hour unit, the EPA was obliged to pay estimated costs of $20,206, plus a fixed fee of $1,515. Costs included direct labor costs for technical man-hours and indirect costs incurred as overhead and general and administrative (G & A) expenses. Indirect costs were subject to ceiling rates which limited overhead costs to 80 percent of the total direct labor dollars, and G & A costs to 10 percent of the total costs incurred, exclusive of G & A expense and overhead dollars. The contract contained standard clauses entitled Audit and Records, Disputes, Changes, and Limitation of Costs (LOC).

The initial task order, issued on March 26, 1974, required ODC to expend 1,000 man-hours calculating potential emissions and reviewing compliance from industrial services in a specified region of the country. The stipulated completion date for this task, originally September 18, 1974, was extended to November 1, 1974.

The EPA exercised its option to order additional work only once during the three-year contract term, in a June 28, 1974, contract modification. The task order actually assigning this work was not issued until February 20, 1975. This second task order under the contract, covering a "Re-

view of Point Source Compliance Data for Industrial Sources in Region 4," provided a six-month period of performance with a completion date of August 1, 1975. ODC confronted a number of problems in completing the second order, including EPA's failure to furnish source files and other technical data in a timely fashion. As a result, the contracting officer extended the performance period to October 24, 1975. However, ODC was unable to complete the second task order by that date.

On February 5, 1976, ODC requested additional funding to complete the second task. It estimated that 100 technical man-hours beyond that provided in the contract would be required. ODC contended that EPA delays had contributed to the need for this additional funding. During the first week of June 1976, while its request for additional funding was still under consideration, ODC delivered its final report on the second task. On June 16, 1976, ODC's chief executive, Dr. Lincoln Teng, and the EPA reached an agreement that ODC's February 5, 1976, request for additional funding would be treated as a cost overrun and that the EPA would pay an additional $2,750. On July 19, 1976, the EPA issued the required modification to allocate these additional funds.

On June 28, 1976, subsequent to the June 16, 1976 agreement but prior to the July 19, 1976, modification, ODC submitted a voucher (Voucher 17) for $2,193.22. The voucher covered "documentation, including editing, typing, tabulating, printing and binding of the report" from May 8 through June 26, 1976. ODC's prior vouchers, including two submitted after the February 5, 1976, request for an additional funding, totaled $46,163.43, which was $28.57 below the contract cost limit of $46,192, as enhanced by the $2,750 increase. By June 28, 1976, the EPA had paid $45,518.24 to ODC for contract work, $673.76 less than the enhanced cost limitation.

For several years thereafter, the contracting officer made numerous unsuccess-

2. The contract defines "technical man-hours" to be man-hours of technical personnel such as engineers, scientists, and draftsmen, and not

man-hours of support personnel such as managers, typists, and key-punch operators.

ful attempts to gain audit access to ODC's costs records. ODC had gone out of business and Dr. Teng left no easily accessible information as to his whereabouts. When contact with Dr. Teng was re-established, he was unable to provide significant assistance because he no longer had access to necessary ODC records. Based upon recommendations by the EPA's Inspector General's Office and Cost Advisory Branch, the contracting officer decided to close out the contract. In a September 9, 1982, memorandum, the contracting officer informed Dr. Teng that the inability to conduct an audit had prompted a unilateral decision to close the contract. The contracting officer indicated that the EPA would pay the balance of the full contract amount ($673.76) upon ODC's submission of a final invoice and a release of claims.

ODC responded to the memorandum in two letters dated October 14 and November 5, 1982, respectively. In the November 5 letter, ODC provided a release, but the release was contingent on payment of an enclosed final invoice. The invoice sought a total of $19,613.62, which consisted of (1) $673.76, the balance due on the contract; (2) $2,164.65 for "added effort," apparently referring to Voucher 17 which had been submitted subsequent to delivery of the final report; and (3) $16,775.21 in additional indirect costs for the years 1973, 1974, and 1975. The $16,775.62 sum was calculated using overhead and G & A rates that were in excess of the rates used in the original billings and in excess of the contract ceiling rates.

In a January 4, 1983, letter, the contracting officer pointed out that the contract required (1) availability of records for audit and inspection and (2) advance notice by the contractor and authorization by the contracting officer before the EPA became liable for overruns. In an April 10, 1983,

letter, ODC presented the same $19,613.62 reimbursement claim and an additional claim for $181,397, and requested a final decision on the matter. ODC submitted a summary account of "Project Funding, Revenue, and Expenditures" but did not provide auditable original records. On May 29, 1983, the contracting officer issued a final decision denying the reimbursement claim in part ($18,939.86), and granting it in part ($673.76). The decision does not mention the additional request for $181,397.

ODC appealed the contracting officer's decision to the IBCA. ODC had not elected to have its claim evaluated under the provisions of the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 601, et seq.[3] On appeal, ODC reiterated its reimbursement claim seeking a total of $19,613.62 to cover retained funds, allowable overrun, and increased G & A and overhead rates. In addition, ODC demanded $181,397 to cover G & A expenses and fixed fee revenues that it would have received had all the work allegedly provided for in the contract been awarded to ODC. ODC contended that the EPA and the SBA had engaged in misconduct which resulted in the EPA not exercising the additional 29 options available under the contract.

In a June 20, 1985, decision, the IBCA responded in detail to ODC's contentions and denied each of ODC's claims except for its $673.76 claim. On May 12, 1986, plaintiff filed this action seeking review of the IBCA's adverse decision under the Wunderlich Act.[4]

*Discussion*

I.

■■■ In a Wunderlich Act case, rather than performing its traditional role as a trial level court, this court sits as an appellate tribunal reviewing the decision of a board below. *Vista Scientific Corp. v.*

---

3. The contract was entered prior to the adoption of the CDA, but the CDA provides that "the contractor may elect to proceed under this Act with respect to any claim pending ... before the contracting officer [on the effective date of the Act] or initiated thereafter." Pub.L. No. 95–563, § 16, 92 Stat. 2383 (1978), contained as historical note in 41 U.S.C. § 601.

4. ODC originally filed a petition with the United States Court of Appeals for the Federal Circuit seeking Wunderlich Act review of the IBCA's decision. In response to a motion by the government, the Federal Circuit transferred ODC's appeal to the United States Claims Court by a March 19, 1986, order of transfer.

*United States*, 808 F.2d 50, 52 (Fed.Cir. 1986). On appeal, a plaintiff may attack both a board's conclusions of law and its findings of fact. While the board's conclusions of law are reviewed *de novo*, this court's review of the board's findings of fact is far more limited. This court must only determine whether the findings are supported by substantial evidence and are not arbitrary, capricious, fraudulent, or "so grossly erroneous as necessarily to imply bad faith." 41 U.S.C. § 321. This court is "barred from reopening or redetermining the facts." *Vista Scientific Corp.*, 808 F.2d at 52.

Plaintiff disputes both the IBCA's findings of fact and its conclusions of law. In attacking the Board's fact findings, plaintiff should have pointed out the particular findings to which it objected and explained why the findings were not supported by substantial evidence, *i.e.*, plaintiff "should have identified the findings and backed up its motion with whatever record excerpts or documents were needed to support its position." *Id.* at 53. But plaintiff has not done that. Plaintiff's briefs present an undifferentiated, rambling, and often incomprehensible mixture of factual and legal allegations and arguments. There is a paucity of both references to the Board's findings of fact and citations to the administrative record. When legal precedent is cited, plaintiff generally fails to apply that precedent to the pertinent findings and conclusions.

■ Plaintiff's approach is unsatisfactory. By failing to focus on specific findings and to cite portions of the record, plaintiff, in effect, is asking this court to examine the entire record on its own and to re-evaluate each factual finding. But it is plaintiff's responsibility to undertake such an examination and to present focused arguments to the court; it is not the role of an appellate court to ferret through an entire administrative record to assess whether the findings of fact are supported by substantial evidence. *See, e.g., Milmark Services, Inc. v. United States*, 731 F.2d 855, 858–59 (Fed.Cir.1984).

This court has reviewed the decision of the Board, the parties' briefs, and, where appropriate, the administrative record. Based on this review, the court concludes that for each of the three claims in dispute, plaintiff has failed to demonstrate that the Board erred in its findings of fact or conclusions of law or that defendant's cross-motion for summary judgment should be denied for any other reason.

## II.

■ The Board found that ODC's claim for $2,164.65 in excess labor costs was barred by the provisions of the LOC clause in the contract. That clause anticipates that a contractor provide prospective notice to the contracting agency of any foreseeable cost overruns. It obliges the contractor to give notice to the government in writing if at any time the contractor has reason to believe either its incurred costs will exceed 75 percent of the approved costs under the contract, or the total cost to the government under the contract will exceed the contract cost ceiling. The LOC clause also provides, in effect, that the government is not liable for costs in excess of the contract ceiling unless the contracting officer, in writing, authorizes the excess costs.[5] The

---

5. The LOC clause provides, in pertinent part:

   (a) ... If, at any time, the Contractor has reason to believe that the cost which he expects to incur in the performance of this contract in the next succeeding sixty (60) days, when added to all costs previously incurred, will exceed seventy-five percent (75%) of the estimated cost set forth in the Schedule, or if, at any time, the Contractor has reason to believe that the total cost to the Government for the performance of his contract, exclusive of any fee, will be greater or substantially less than the then estimated cost, hereof, the Contractor shall notify the Contracting Officer in writing to that effect, giving the revised estimate of such total cost for the performance of this contract.

   (b) [T]he Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract (including actions under the Termination Clause) or otherwise to incur costs in excess of the estimated cost set forth in the Schedule, unless and until the Contracting Officer shall have notified the Contractor in

Board found that the claim for $2,164.65 was barred under the LOC clause because ODC had failed to give the required prospective notice of the cost overrun.

Plaintiff contends that it did provide adequate notice under the LOC clause and, in any event, that the government is estopped by the actions of government personnel from asserting the LOC clause as a bar to ODC's $2,164.65 overrun claim. Plaintiff bases its contention that it provided adequate notice on two sets of communications. First, plaintiff contends that it provided notice to the EPA at meetings between ODC and EPA personnel at which ODC gave "constant crying notice" and "pleas for funding." But plaintiff's explanation of these alleged meetings is extremely vague. It is not clear when the meetings occurred, how many there were, or what was said. In addition, plaintiff does not even allege that its notice was in writing as required by the LOC clause, or that it received a responsive, written authorization from the contracting officer. Plaintiff does not cite to anything in the administrative record that supports the conclusion that such notice was given, much less that the notice was in the form and at a time required by the LOC clause.

Plaintiff's second alleged "notice" is its submission of Voucher 17, dated June 28, 1976. But the Board found that the costs listed in Voucher 17 were foreseeable before they were incurred. If this finding is supportable, Voucher 17, which was submitted after the cost overrun had occurred and after the final report on the second task order had been submitted, would not have been timely notice under the LOC clause. Upon review, there is substantial evidence in the administrative record to support the Board's finding that the costs in issue were foreseeable. The evidence supports the conclusion that the work involved was labor intensive and that ODC should have been aware that the work would result in a cost overrun significantly in advance of its decision to undertake the work.

writing that such estimated cost has been in-

Plaintiff bases its alternative argument, to the effect that the government is estopped from relying on the LOC clause, on its allegation that an EPA technical advisor had ordered ODC to perform the work in issue. But plaintiff has not cited any part of the record which could support a conclusion that it was so ordered. Moreover, even assuming that an EPA representative had indicated that the work should be done, this alone would not estop the government from relying on the LOC clause. The Court of Appeals for the Federal Circuit discussed the circumstances that could estop the government from relying on an LOC clause in *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110 (Fed.Cir.1985). The court stated:

(1) [T]he party to be estopped must know the facts, *i.e.*, the government must know of the overrun; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts, *i.e.*, that no implied funding of the overrun was intended; and (4) the contractor must rely on the government's conduct to its detriment.

*Id.* at 1113 (citations omitted).

Plaintiff has not cited evidence in the record that supports a finding in its favor as to any one of these prerequisites, much less all of them. Defendant, on the other hand, has cited record evidence that supports the conclusion that estoppel does not lie. For example, as to the first prerequisite that the government must know of the overrun, the government points to internal EPA documents in the administrative record that indicate that at least up to early June 1976, subsequent to EPA's receipt of the final report on the second task order, EPA officials were of the belief that the funds sought in Vouchers 15 and 16 were the last funds ODC would request to complete the second task order.

creased. . . .

## III.

■ Plaintiff is similarly deficient in its effort to support its claim seeking $16,775.21 to cover G & A and overhead costs allegedly incurred in excess of the contract ceiling rates for the years 1973, 1974, and 1975.

ODC argued to the Board that the contract ceiling rates do not apply because the EPA's delays in issuing task orders and providing computer data entitled ODC to an equitable adjustment of the contract ceiling rates. The Board noted that, to the extent that ODC contended the delays constituted a breach of contract, the Board was without jurisdiction to hear the claim because the contract was entered before enactment of the CDA and ODC had not elected to be covered by its provisions.[6] The Board then turned to plaintiff's argument that it was entitled to an equitable adjustment under the terms of the contract. The Board acknowledged that government delays could potentially give rise to an obligation to make such an equitable adjustment, but the Board concluded that plaintiff had failed to establish the factual prerequisites for such an adjustment.

The Board focused on two decisions of boards of contract appeals which involved *de facto* suspensions under the suspension clause of a contract. *Paccon, Inc.*, ASBCA No. 7890, 1963 BCA ¶ 3659 (1963); 65–2 BCA ¶ 4996 (1965); 65–2 BCA ¶ 5227 (1965); *T.C. Bateson Constr. Co.*, ASBCA No. 5492, 60–1 BCA ¶ 2552 (1960). The IBCA reasoned that by analogy, these decisions support the conclusion that a delay can constitute a *de facto* stop-work order which could give rise to an equitable adjustment under the stop-work order clause of a contract. After reviewing the evidence, however, the Board concluded that ODC had failed to establish the prerequisites for such recovery.

First, the Board interpreted *Bateson* as placing the burden on the contractor to show that the government action caused the work stoppage, that the work stoppage unreasonably delayed the progress of the work and caused additional expense to the contractor, that the delay was for an unreasonable length of time, and that the government's delay constituted a breach of duty that, in the absence of a suspension clause (here a stop-work clause), would have constituted a breach of contract. After reviewing the evidence before it, the IBCA concluded that ODC had fallen far short of satisfying the *Bateson* requirements. The Board stated:

> Although there apparently were delays and EPA admits that there were and that it was responsible for them at least in part, the mere existence of Government-caused delays does not establish the proof necessary under *Bateson*. Other than the facts that EPA granted extensions and admitted to having caused delays, ODC's only proof ... is complaint paragraphs and a supplemental appeal file exhibit prepared for the appeal in which appear certain statements about performance progress as related to calendar periods corresponding with voucher periods. The statements are of this nature: "forced idling—waiting"; "chronical [sic] idling—waiting for EPA data to work on"; "chronical [sic] idling—waiting persisted"; "inhumanly cruel waiting—idling"; etc. For the most part these descriptions correspond to periods for which ODC billed and was paid. That is not the only disability of this asserted proof. Being self-serving in nature but affording no opportunity for rebuttal or even inspection, these statements amount to nothing more than allegations and may not be taken as the proof necessary to carry ODC's burden....

Next, as to *Paccon*, the IBCA stated that "the *Paccon* case announces the additional logical requirement that the *de facto* suspension be related to the costs claimed." The Board found that ODC did not satisfy this requirement either, and stated:

---

6. Prior to the CDA, many boards had held that they did not have jurisdiction to entertain breach claims. *United States v. Utah Constr.* *and Mining Co.*, 384 U.S. 394, 406, 86 S.Ct. 1545, 1552, 16 L.Ed.2d 642 (1966).

Therefore ... "Appellant has the burden of showing the specific costs that were increased by the suspensions and the amount of such increases." *Paccon*, 1963 BCA par. 3659 at 18,355. The approach, then, of applying the entire overhead (or G & A) rate for a particular year, then, does not satisfy this burden, and given the unavailability of ODC's cost records, it would appear to be impossible to carry the burden in any event.[7]

Plaintiff contests the Board's denial of the $16,775.21 claim but does not demonstrate that the factual findings upon which the denial was based are not supported by substantial evidence. Plaintiff simply did not present sufficient evidence before the Board to satisfy its burden to demonstrate that it was caused $16,775.21 in damages by the government's delays. As the Board suggested, rather than supplying auditable cost records to support the damages, plaintiff relied essentially upon self-serving allegations of damage without any firm evidentiary support.[8]

Finally, plaintiff contends that because it alleges the delays constituted a breach of contract and because the Board concluded that it did not have jurisdiction over any breach claim, this court should consider the claim for $16,775.21 *de novo* and not limit its review to the record before the IBCA as ordinarily would be required in appeals under the Wunderlich Act. But, in any event, plaintiff has not specifically pointed to any provision in the contract that was allegedly breached by the delays in issue and has not presented evidence sufficient to demonstrate the existence of a material issue of fact as to the existence of any such breach. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting, Inc.*, 833 F.2d 1560, 1562 (Fed.Cir. 1987). Moreover, plaintiff alleged before the Board, and the Board apparently agreed, that relief for damages caused by government delay was potentially available under the terms of the contract.[9] Where a contractor seeks unsuccessfully to secure the complete relief available under the contract from a board of contract appeals, it cannot thereafter recharacterize the government's conduct as a breach of contract and bring a breach action in this court seeking the same relief. *See, e.g., Morrison–Knudsen Co. v. United States*, 170 Ct.Cl. 757, 762–64, 345 F.2d 833, 836–37 (1965) (cited with approval in *United States v. Utah Constr. and Mining Co.*, 384 U.S. 394, 402, 86 S.Ct. 1545, 1550, 16 L.Ed.2d 642 (1966)); *L.W. Foster Sportswear Co. v. United States*, 186 Ct.Cl. 499, 502, 405 F.2d 1285, 1287 (1969); *La Crosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 172, 432 F.2d 1377, 1380 (1970).

### IV.

Plaintiff's final monetary claim for $181,-397 in compensatory damages apparently is based on the government's alleged bad faith in failing to award all of the work potentially available to plaintiff under the contract. Before the Board, ODC made a series of strong statements alleging fraud-

---

7. The Board also rejected plaintiff's claim as not timely filed under the stop-work order of the contract. The claim was filed approximately 6½ years after the final report. The contract provided that stop-work order claims should be filed within 30 days following resumption of work and that negotiated overhead rate claims should be filed within 90 days following the end of the accounting year. ODC contends that it tried to meet the required time periods and that, in any event, the government was not prejudiced by any delay. But plaintiff does not dispute that it failed to make the request within the 30–day period, and that waiting 6½ years to file a claim hardly can represent a diligent effort. Moreover, the government apparently was prejudiced in that plaintiff apparently no longer had in its possession the type of comprehensive records the government needed to audit a claim.

8. ODC presented copies of pay stubs of certain of its employees. But these stubs are not themselves sufficient to calculate the amount of overhead costs that related to the contract, much less that the costs were in fact the product of the government's delays.

9. In plaintiff's response to the court's February 23, 1989, order, plaintiff contends for the first time that complete relief was not available under the provisions of the contract for this claim. However, plaintiff makes this contention in a conclusory fashion and does not provide any hint as to its rationale for that conclusion.

ulent and malevolent motives and bad faith actions by the EPA and the SBA. The Board concluded that "there has been no showing that would prove them and they remain mere allegations as a result." On appeal, plaintiff simply reiterates the same basic allegations. Plaintiff has not pointed to any evidence in the record that indicates that the Board was incorrect in its treatment of the allegations of bad faith.

█ Plaintiff contends, however, that *de novo* review of its claim for $181,397 is appropriate because the claim is one for breach of contract. Plaintiff apparently contends that it was a breach of contract for the government to grant ODC only two task orders and not the remaining 29 orders potentially available under the contract's option clause. But even assuming that plaintiff were entitled to *de novo* review,[10] plaintiff would not prevail against defendant's cross-motion for summary judgment. The government's failure to exercise an option in a contract does not ordinarily give rise to a breach of contract action. A standard option provision in a government contract obliges the contractor to perform the additional contract work if the government chooses to exercise the option, but it does not create a legal obligation on the part of the government to exercise the option and require the work. *See Dynamics Corp. of Am. v. United States*, 182 Ct.Cl. 62, 74, 389 F.2d 424, 431 (1968); *Government Systems Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed.Cir.1988).

█ Though plaintiff allegedly believed that it would receive all of the work potentially available under the contract, the contract obliges the government to assign only one 1000 man-hour task to plaintiff and leaves any other assignment of work to the discretion of the government.[11] Plaintiff apparently based its mistaken belief that it

would receive the additional work on the "Scope of Work," "Option for Additional Work," and "Peak Level of Effort" provisions of the contract and, in addition, on the provisions of the Small Business Act, 15 U.S.C. § 631, *et seq*. But none of these contract provisions binds the government to provide any additional quantity of work. The contract provisions merely describe, respectively, the variety of tasks that *could* be assigned, the government's option to order additional work, and the maximum amount of work the government could order in any one 90–day time period. Similarly, plaintiff has not pointed to any provision of the Small Business Act that remotely could be interpreted as obliging the government to exercise the additional options.

█ In its brief in response to defendant's cross-motion for summary judgment, ODC again raises allegations of bad faith ranging from collusion on the part of the EPA, the SBA, and the IBCA to drive ODC out of business, to "vicious attempts" upon plaintiff's director's life by the SBA program manager. But as was the case before the IBCA, plaintiff has not presented any significant evidence to support these allegations. To defeat a properly based motion for summary judgment, the nonmoving party cannot rely on mere allegations in its complaint or its briefs but must present evidence to support its allegations. *Sweats Fashions*, 833 F.2d at 1562. The evidence must demonstrate the existence of a dispute as to a material issue of fact. It must be of sufficient weight so that the trier of fact could reasonably find in favor of the nonmoving party as to the existence of that material fact. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11. Herein, plaintiff has not presented sufficient evidence to demonstrate the existence of a material issue of fact concerning its allega-

---

**10.** Though plaintiff did not dispute the Board's jurisdiction to entertain the claim for $181,397 when it presented that claim, plaintiff now contends that the Board was without jurisdiction to entertain that claim because the contracting officer had never issued a final decision on the claim and, in addition, that adequate relief was not available under the contract for the claim.

**11.** The "Option for Additional Work" portion of the contract states that "[a]t the option of the Government, additional work may be order [sic] under this contract in 1,000 man-hour increments up to a maximum of 30,000 additional man-hours."

tion that it was entitled to $181,397 based on a breach of contract theory.[12]

## Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted. The Clerk of the Court shall dismiss the complaint. No costs.

IT IS SO ORDERED.

---

12. Finally, plaintiff asserts in its briefs, but not in its complaint, a "Punitive Damage Claim in Nonmonetary Terms With Special Merit," in which plaintiff asks this court to order the EPA to award plaintiff a replacement contract that would "effectively make ODC fully whole." While plaintiff asserts that it can "assure the

super-merits for the Punitive Damage Claim," this court is clearly without jurisdiction to award such equitable relief. *See Cleveland v. United States,* 9 Cl.Ct. 741, 746 (1986), and the cases cited therein.