Alfred R. CHOUINARD, II and Ginger Leigh Chouinard, Plaintiffs-Appellants,

v.

Alfred F. CHOUINARD et al., Defendants-Appellees.

No. 76–2766.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1978.

Glenville Haldi, Atlanta, Ga., for plaintiffs-appellants.

Terrence Lee Croft, Bettie W. Driver, Atlanta, Ga., for defendants-appellees.

Before BROWN, Chief Judge, THORNBERRY, and MORGAN, Circuit Judges.

THORNBERRY, Circuit Judge:

This diversity action for the cancellation of two promissory notes on grounds of duress stems from a bitter family feud. Plaintiffs-appellants Fred Chouinard and his wife Ginger brought suit to set aside the two notes totalling $190,000 that they had executed to Al and Ed Chouinard, Fred's father and twin brother, respectively. In response to two interrogatories, the jury found that the notes had been executed under duress but that plaintiffs had waived their duress claim by making voluntary payments. The district court entered judgment for defendants and denied plaintiffs' motions for judgment notwithstanding the verdict and a new trial. We affirm.

Fred Chouinard is the president of ARC Security, Inc., a company that provides security guards to approximately sixty customers in the Atlanta area, including the airport and a sports arena. The company, which has some 360 employees, was begun in early 1970 with a $2000 contribution

from Fred and $2000 each from Al and Ed. Over the years a dispute arose as to the precise nature of Al and Ed's ownership interest in the corporation, though the record indicates that the parties intended Al and Ed to be stockholders. Resolution of this issue was not attempted by the district court and is unnecessary here, but some background information is essential.

By late 1972, both the company and the stock ownership dispute were thriving. In December Fred sent to his father a proposed settlement agreement by which Fred would receive 70 per cent of the purchase price if the company were sold, while Al and Ed would split the remaining 30 per cent. Fred added that he hoped to sell the company for a million dollars, though, of course, this does not mean the company was worth that much at the time. The three men did not agree on the settlement.

A few months later, in August 1973, Consolidated Foods offered Fred $700,000 for the company, though Fred testified that this was not a "firm" offer. Nonetheless, he included in a personal financial statement a year later that the offer had been made. A couple of months after the Consolidated Foods offer, the family was still in the throes of the stock ownership dispute, and Fred offered Al and Ed each $30,000 in exchange for a release of their claims. At this point the attorney representing Ed and Al asked for the company's financial records.

Ed, who holds a master's degree in finance as well as a doctorate in engineering, received the records in December and estimated from them that the company was worth more than a million dollars. Using the initial capital contributions to form the corporation as a guide, he concluded that he and his father each owned 37½ per cent of the business, or close to $500,000, based on his financial analysis.

By January 1974, however, the company was experiencing severe financial problems, due in no small part to a business deal Fred later described as "foolish." He purchased an option on an airport parking lot, and at the same time several clients did not pay their bills. As a result, the company was short of funds to meet the next payroll. The company was unable to secure financing from various banks and other lending institutions, and two banks withdrew the "line of credit" financing that they had been extending the company.

Thus, the company had two problems: replacing its "line of credit" financing and obtaining immediate funds to meet its next payroll of some $50,000. The latter was considered "critical," for if the payroll were not met, the company could not have serviced its customers and would have been out of business. At this point Fred felt the company was worth well under $200,000.

Fred was able to obtain financing from the Walter E. Heller Company of Georgia, a commercial lender. This arrangement allowed him to meet his payroll and also provided the line of credit financing. During negotiations with Fred, Heller learned that Al and Ed claimed a stock ownership interest and made clear that it would not make a loan until the stock ownership dispute was settled.

Fred then informed his father and his father's attorney about the necessity of obtaining this financing and told them that Heller would not loan the money unless the ownership problem were resolved. Al told Fred about Ed's financial analysis and their claim to half a million dollars each and suggested settling "for like three times what [Fred] offered, three times thirty thousand dollars, or ninety thousand dollars." (R. 338). The attorneys for both sides were involved in the process, with Fred's attorney drafting a proposed instrument in which all parties would agree that Heller could make the loan but that no one acknowledge anyone else's ownership claim. This proposal was apparently never "put on the table," for the attorney for Ed and Al informed Fred's counsel that this was a good occasion to settle the ownership issue. Fred's counsel labeled that approach as "blackmail," but he realized that the Heller loan was essential.

On January 9, counsel for Ed and Al met with Fred and his attorney in Fred's office.

Fred and Ginger executed two promissory notes, one to Ed and one to Al, calling for immediate payment of $5000 followed by installment payments totalling $90,000, in exchange for releases by Ed and Al of all their claims to ownership in the company. Fred immediately closed the loan with Heller and obtained the much-needed funds.

Subsequently, it was discovered that the notes contained typographical errors on the signature pages, so Fred and Ginger re-executed those pages. A few days later Fred sent the initial $5000 payment to both Ed and Al and several weeks later reimbursed them for incidental expenses they incurred in expediting the exchange of the releases and the notes. Fred made monthly payments to Ed and Al on the notes from February 1974 until this suit was filed in March 1975 and thereafter made the payments to the registry of the district court. Fred never told or wrote them about any claim of coercion or duress in connection with the transaction, though Fred's attorney spoke with their attorney about the problem.

Because the jury found that there was duress, Fred and Ginger focus their argument on the finding that they had made voluntary payments on the notes, thus waiving their duress claim. They contend that there is no evidence to support this finding because nothing indicates that the duress ever ceased. They also complain that the court failed to instruct the jury that defendants had the burden of proof on the question of waiver, which is an affirmative defense. Ed and Al raise the additional point that there was in fact no duress.

We conclude that there was no duress as a matter of law and that the trial court erred in submitting the issue to the jury. Accordingly, we affirm the judgment in favor of defendants and find it unnecessary to reach the other issues presented.

At the outset, we note that defendants-appellees did not bring a cross-appeal but rather asserted a "no duress" argument in their brief. It is true, of course, that an appellee who wishes to secure alteration or modification of a judgment must cross appeal. *See Colvin v. Dempsey-Tegeler & Co.,* 477 F.2d 1283, 1293 (5 Cir. 1973); *Helvering v. Pfeiffer,* 302 U.S. 247, 58 S.Ct. 159, 82 L.Ed. 231 (1937). However, it is axiomatic that only a party aggrieved by a final judgment may appeal. If the appellee is fully satisfied with the judgment actually rendered, he need not cross appeal, even though he wishes to argue on appeal, in support of the judgment, that the district court erred regarding particular rulings or the reasons for the judgment. *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *Spurlin v. General Motors Corp.,* 531 F.2d 279, 280 (5 Cir. 1976). That is the situation here, for defendants are urging an alternative theory in support of a judgment favorable to them.

Defendants twice moved for a directed verdict at trial, thus asserting that on the facts developed they were entitled to judgment as a matter of law.[1] In examining the duress question, our standard of review is the same as the trial court's in passing on a motion for directed verdict or judgment notwithstanding the verdict: whether the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable men could not arrive at a contrary verdict. *Boeing Co. v. Shipman,* 411 F.2d 365 (5 Cir. 1969); *Sulmeyer v. Coca-Cola Co.,* 515 F.2d 835 (5 Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *Duriso v. K–Mart,* 559 F.2d 1274 (5 Cir. 1977).

This case actually involves a species of duress commonly known as economic duress or business compulsion. Although Georgia cases specifically applying the doctrine are virtually non-existent,[2] the Geor-

---

1. There was obviously no need for defendants to move for judgment notwithstanding the verdict, since the verdict was in their favor due to the jury's determination of the waiver issue.

2. The parties have cited no Georgia cases discussing this particular type of duress, and our research has revealed none. The state's general law of duress is codified at Ga.Code Ann. § 20–503 (1977).

gia courts have consistently applied duress principles in various business contexts.[3] Because the law of duress in Georgia dovetails well with accepted principles of the doctrine of business compulsion, we have no difficulty in applying those principles here. A contract is voidable where undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement.[4] However, a duress claim of this nature must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim. Thus, the mere fact that a person enters into a contract as a result of the pressure of business circumstances, financial embarrassment, or economic necessity is not sufficient.[5] Unless wrongful or unlawful pressure is applied, there is no business compulsion or economic duress,[6] and such a claim cannot be predicated on a demand which is lawful or on the insistence of a legal right.[7] See generally 17 C.J.S. Contracts § 177 (1963); 13 Williston on Contracts § 1617 (3d ed. 1970).

In the instant case, it is clear that the financial distress in which Fred found himself and his company was of his own making. He admitted that he had made "foolish" business judgments that had put the company in a bind regarding its cash flow.

Moreover, at that point the banks with whom the company had been dealing withdrew their "line of credit" financing. Ed and Al, who had nothing to do with the day-to-day operation of the company, obviously were not responsible for this sad state of affairs, and there is no contention that they ever discussed the situation with Heller.

While there is ample evidence of economic necessity and financial peril, neither the "threat of considerable financial loss"[8] nor "impending bankruptcy"[9] establish economic duress. Such economic stress must be attributable to the party against whom duress is alleged. "Mere hard bargaining positions, if lawful, and the press of financial circumstances, not caused by the [party against whom the contract is sought to be voided], will not be deemed duress." Business Incentives Co. v. Sony Corp. of America, 397 F.Supp. 63, 69 (S.D.N.Y.1975).

The only possible claim of duress is that Ed and Al, recognizing the weakened state of the company, seized that opportunity to settle the long-standing dispute regarding stock ownership. Because duress may not be implied merely from the making of a hard bargain, the question becomes whether the conduct of Ed and Al was wrongful. The law in Georgia and other

3. E. g., Causey v. Matson, 215 Ga. 306, 110 S.E.2d 356 (1959) (lease of service station); Love v. State, 78 Ga. 66, 3 S.E. 893 (1887) (sale of a mule); Camp v. Hatcher, 119 Ga.App. 63, 166 S.E.2d 422 (1969) (dispute over attorneys' fees); Dean v. Wilson, 100 Ga.App. 710, 112 S.E.2d 315 (peanut farming); Atlanta Life Ins. Co. v. Mason, 89 Ga.App. 319, 79 S.E.2d 352 (1953) (threatened discharge from employment); and Farrar Lumber Co. v. Citizens' Bank, 48 Ga.App. 319, 172 S.E. 724 (1934) (threatened foreclosure).

4. See Ga.Code Ann. § 20–503 (1977); Yearwood v. National Bank of Athens, 222 Ga. 709, 152 S.E.2d 360 (1966).

5. Kohen v. H. S. Crocker Co., 260 F.2d 790 (5 Cir. 1958) (business compulsion not established merely by proof that consent was secured by pressure of financial circumstances). See also Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3 Cir. 1975); Undersea Eng. & Constr. Co. v. International Telephone & Telegraph Corp., 429 F.2d 543 (9 Cir. 1970); John-

son, Drake & Piper, Inc. v. United States, 531 F.2d 1037, 209 Ct.Cl. 313 (1976).

6. Causey v. Matson, 215 Ga. 306, 110 S.E.2d 356 (1959) (act must be wrongful to constitute duress). See also La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 193 Ct.Cl. 168 (1970); Weinreb v. International Banknote Co., 422 F.Supp. 856 (S.D.N.Y.1976).

7. Williams v. Ruben, 216 Ga. 431, 117 S.E.2d 456 (1960); Bond v. Kidd, 122 Ga. 812, 50 S.E. 934 (1905); Friedman v. Bache & Co., 321 F.Supp. 347 (S.D.Fla.1970), aff'd, 439 F.2d 349 (5 Cir. 1971).

8. International Telephone & Telegraph Corp. v. United States, 509 F.2d 541, 549 n.11, 206 Ct.Cl. 37 (1975).

9. Undersea Engineering & Constr. Co. v. International Telephone & Telegraph Corp., 429 F.2d 543, 550 (9 Cir. 1970).

jurisdictions makes clear that it was not, for the two men were merely asserting a legal right, *i. e.,* their right to a certain share of the stock in the company. *See Causey. v. Matson,* 215 Ga. 306, 110 S.E.2d 356 (1959); *Williams v. Ruben,* 216 Ga. 431, 117 S.E.2d 456 (1960). Fred admitted that Ed and Al were stockholders in the company, and the long-standing dispute was over the percentage of the company each owned.[10] Thus, while there is no doubt that Fred was between the proverbial rock and a hard place, it is clear that his own actions put him there and that Ed and Al merely took advantage of the situation to insist upon settlement of the intrafamilial stock squabble.

█ If, for example, Ed and Al had threatened to sue Fred in order to resolve the stock ownership question, it is clear that there would have been no duress, for it is not duress to bring or threaten to bring a civil suit. *Causey v. Matson, supra.* If they had brought such an action, Fred obviously would have faced the same difficulties in obtaining the loan from Heller. Since there would be no duress in that situation, there similarly is no duress where, as here, there was a settlement rather than a suit or threatened suit.

█ We conclude, therefore, that there is simply no duress shown on this record, for one crucial element is missing: a wrongful act by the defendants to create and take advantage of an untenable situation. Ed and Al had nothing to do with the financial quagmire in which Fred found himself, and we cannot find duress simply because they refused to throw him a rope free of any "strings." Accordingly, we affirm the judgment in favor of the defendants.[11]

AFFIRMED.

10. Of course, we take no position on the question of Ed and Al's asserted ownership interest. It is obvious, however, that their claim is a colorable one and is not a frivolous contention made in bad faith. After all, this dispute has been going on for several years and did not arise in connection with Fred's financial trouble.

11. We add one other observation of social rather than legal significance. It is sad indeed to

see a family split apart by money. The company was successful, and Al and Ed obviously wanted to share in that success in a manner proportionate to their initial cash contributions. Fred, however, apparently considered that unfair because he alone was responsible for the venture's success. It is unfortunate that family disputes such as these occur, and even more unfortunate that they have to be resolved in court.