George MARTIN, Jean Martin and Martin Industries, Inc., Plaintiffs,

v.

FLEET NATIONAL BANK, Defendant.

Civ. A. No. 86–0233 P.

United States District Court,
D. Rhode Island.

Dec. 9, 1987.

Harry W. Asquith, Jr., Providence, R.I., for plaintiffs.

Richard P. McMahon, Providence, R.I., Elkan Abramowitz, New York City, for defendant.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

In 1952, George Martin started his own business, J. Regan Steel Erection Company, Inc. In 1975, after a change in the tax structure, George Martin incorporated Martin Industries as the parent of J. Regan Steel Erection Company. By 1983 both companies had ceased doing business because of the financial devastation that hit Mr. Martin and that flowed from the facts underlying the present action before the court.[1]

This action is now adjudicated on a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. Originally, defendant had moved for a Judgment on the Pleadings pursuant to Fed.R.Civ.P. 12(c). After submission of documents outside the pleadings, however, this court elevated defendant's motion to one for summary judgment in accordance with Fed.R.Civ.P. 12. Fulfilling the requirements of Fed.R.Civ.P. 12(c) and D.R.I.Loc.R. 12, a hearing was held on November 10, 1987 at which hearing defendant stated that it did not controvert or dispute any of the facts alleged by plaintiff. Briefly, these facts are as follows.

---

1. Deposition of George H. Martin at 11–12.

## FACTS

Between 1970 and 1975, George Martin through J. Regan Steel Erection Company bought many properties in and around the Richmond–Charlestown area of Rhode Island. By 1977, Martin Industries owned in essence an entire town.[2] This town, called Shannock Village, is the single tract of land that forms the basis for the many dealings that constitute the case at bar.

During the acquisition of Shannock Village, J. Regan Steel Erection Company and Martin Industries had an ongoing relationship with the Rhode Island Hospital Trust National Bank. In 1978, however, when their joint obligations to the Rhode Island Trust National Bank reached approximately $500,000.00 this lending institution advised George Martin that no further working capital would be forthcoming.[3] At this time, George Martin, through his accountant, approached Mr. Robert Daigle, an officer of Fleet National Bank [hereinafter Fleet] to arrange for the transfer of Mr. Martin's accounts to that bank in exchange for additional working capital. In May, 1978, Fleet agreed to pay off Mr. Martin's debt of $500,000.00 to Rhode Island Hospital Trust National Bank as well as to advance to him an additional $150,000.00 of working capital.[4] This loan was collateralized with the Shannock Village properties.

George Martin and Fleet both understood that the loan would be paid from the cash flow of Mr. Martin's business. Unfortunately, however, Mr. Martin's business suffered from the general decline in the construction industry during this period.[5] As a result, Mr. Martin requested and received two additional loans from Fleet. On or about March 23, 1979, Mr. Martin received an additional $100,000.00 and on or about July 3, 1979, Mr. Martin received $150,000.00. Both of these loans were guaranteed by Mr. Martin's home in West Warwick, Rhode Island.[6] At this time, Fleet advised Mr. Martin that he should turn the Shannock Village properties "over to cash." [7]

Deciding to sell the town as a single unit, Mr. Martin, through a real estate agent, negotiated the sale of Shannock Village for $1,500,000.00 to a Mr. Erban.[8] On December 20, 1978, however, when Mr. Erban failed to appear at the closing, this deal collapsed.[9] Immediately after the collapse of this sale, Mr. Martin began to negotiate a purchase agreement with the Narragansett Indian tribe. These negotiations continued from January, 1979, until May, 1980, and involved a purchase price of approximately $3,000,000.00.[10] To procure the necessary financing, however, the Narragansett Indians needed official recognition as a tribe. When, in the spring of 1980, it became clear that such recognition was still a year or two in the future, this deal also collapsed.[11]

At this point, as Mr. Martin relates, "everybody was upset." [12] According to Mr. Martin, Mr. Daigle, the officier at Fleet, insisted that the properties had to be sold "or we're going, or downtown is raising hell that they're going to put you in bankruptcy." [13] Under the threat of bankruptcy Mr. Martin began advertising in ninety percent (90%) of all the newspapers throughout the country—including, among others, the Wall Street Journal, the New York Times, the Boston Globe and Yankee Magazine.[14]

---

2. Id. at 16–18.

3. Id. at 58.

4. Id. at 59.

5. Id. at 62.

6. Id. at 61.

7. Id. at 64.

8. Id. at 66.

9. Id.

10. Id. at 69–73.

11. Id. at 74–88.

12. Id. at 88.

13. Id.; see also id. at 88, 98, 102, 101, 178, 187, 190–91, 206–07; Deposition of Steven Ursillo on May 6, 1987, at 157.

14. Deposition of George H. Martin at 89.

During this period in June, 1980, Sandy Neuschatz approached Mr. Martin and expressed an interest in the Shannock Village property.[15] Mr. Martin then referred Mr. Neuschatz to Mr. Daigle at Fleet who had told him that all deals that Mr. Martin was "making or wanted to make had to go through him."[16] According to Mr. Martin, Fleet began to act in effect as "the brokers" for the Shannock properties.[17]

Mr. Neuschatz headed an investment group of doctors, lawyers and other professionals from New York. After many proposals and counterproposals, an agreement was reached during the early fall of 1980 that the Neuschatz group would buy the entire town in a number of phases. The real estate sales of the Phase I properties were scheduled to begin closings in November, 1980, with the defendant Fleet providing conventional mortgages to the purchasers.[18] It was understood then that the Neuschatz group would make a five percent (5%) downpayment and that Fleet would arrange the financing on the balance.[19] November came and went, however, without any closings.

On January 6, 1981, officials of Fleet and of the Rhode Island Housing and Mortgage Finance Corporation [hereinafter RIHMFC] visited Shannock Village.[20] Following the tour of Shannock Village by the RIHMFC officials, Mr. Martin was informed by Robert Daigle of Fleet that RIHMFC mortgages would be given to those members of the Neuschatz group purchasing the Phase I properties of Shannock Village.[21] While Fleet had procured these mortgages for the Neuschatz group, their terms nevertheless differed from the original agreement. In particular, Mr. Daigle instructed Mr. Martin that RIHMFC required that each mortgage amount to only eighty percent (80%) of the purchase price for each sale.[22]

This change threatened the entire deal because the Neuschatz group could not afford a twenty percent (20%) downpayment toward the purchase of the Phase I real estate.[23] To save the deal, Robert Daigle of Fleet informed Mr. Martin that "[w]e've got to do what we've got to do" and insisted that Mr. Martin both reduce that price of the Phase I properties to enable the Neuschatz group to meet the RIHMFC requirements and forgo any actual downpayments on the sale of the Phase I properties. Mr. Martin protested but was told that if he refused he would face financial ruin and bankruptcy.[24] As a result, Mr. Martin was forced to sell the properties at a reduced price and to proceed with the sales of the Phase I properties without receiving any downpayments from the Neuschatz

**15.** Id. at 93, 97.

**16.** Id. at 102.

**17.** Id.

**18.** Id. at 186; Deposition of Sanford Neuschatz on September 20, 1986, at 42–43; Exhibit G, Credit Memorandum of defendant prepared by Robert Daigle on September 26, 1980, in plaintiff's submission of November 9, 1987; Exhibit H, Interoffice Letter of defendant prepared by Robert Daigle on October 14, 1980, in plaintiff's submission of November 9, 1987; Exhibit I, Interoffice Letter of defendant prepared by Robert Daigle on December 22, 1980, in plaintiff's submission of November 9, 1987; Exhibit J, Letter of defendant prepared by Robert Daigle on November 18, 1980, in plaintiff's submission of November 9, 1987.

**19.** Deposition of George H. Martin at 146, 186; Deposition of Sanford Neuschatz on September 19, 1986, at 52, 54–56; Deposition of Sanford Neuschatz on September 20, 1986, at 43.

**20.** Deposition of George H. Martin at 161; Deposition of Sanford Neuschatz on September 20, 1986, at 41.

**21.** Deposition of George H. Martin at 186; Exhibit K, Interoffice Letter of defendant prepared by Robert Daigle on January 19, 1981, in plaintiff's submission of November 9, 1987.

**22.** Deposition of George H. Martin at 176–77, 186–87; Deposition of Sanford Neuschatz on September 19, 1986, at 63–65.

**23.** Deposition of George H. Martin at 173–74, 190; Deposition of Sanford Neuschatz on September 19, 1986, at 63–65; Deposition of Steven Ursillo on May 6, 1987, at 144–45.

**24.** Deposition of George H. Martin at 173–75, 186, 192, 646; Deposition of Sanford Neuschatz on September 19, 1986, at 66–69.

group.[25] In addition, to prevent RIHMFC from withdrawing their financing, Mr. Martin was also forced to act as though the downpayments had been made.[26] During his deposition, Martin himself summarized the situation at this point.

I can remember being down there with Bob Daigle discussing the upcoming closings on some of these properties, that some of these homes was going under RIHMFC, and they would have to go by the guidelines set up by them. There was a low interest rate of twelve, twelve-and-a-half percent, in that vicinity, talked about, and some of these houses would have to be lowered in order to meet the guidelines of RIHMFC....

... I can remember about the downpayments, that because of the problem in November, October–November, they were supposed to have had closings on the first ten or twelve homes and there was only supposed to have been a five percent downpayment; and after RIHMFC people came down there in January or February, that it went up to twenty percent downpayment and ... I went down to see Bob Daigle about this twenty percent down because the Neuschatz crowd or group was just falling apart at the seams, and he told me that these sales was going to go forward, and whatever we had to do, we had to do it or the bank had to do it. We discussed downpayments and said there would be— with the way this group is right now, they haven't got got the money to put this twenty percent down and that we just have to go along with it. I said, "Well, what about the downpayments that I am supposed to receive?" He says, "We've just got to get these properties—start selling these properties or else you know what I've been telling you

right along about threats from downtown on foreclosing on these properties." [sic] So, whatever figures you got to come up with in order to meet certain guidelines that's been set up with RIHMFC, I [sic] [you] just got to go along with it.["] I questioned him about [this], "Well, that's fine. If that's the case, I will take a second mortgage on these properties," and he says, "No way, George, that you can do it to go into closings. You just got to act as though this downpayment had been paid." [27]

Nor were Fleet's dealings with Mr. Martin—in person, on the phone and through the mails—the only questionable activities done on the part of Fleet. Fleet's dealings with the agents of RIHMFC—in person, on the phone and through the mails—were also highly questionable.

Fleet knew that the RIHMFC mortgages which defendant procured for the Neuschatz group and with which the Neuschatz group would purchase the Phase I properties of Shannock Village were available only for residents of Rhode Island who would use the purchased property for their primary residence.[28] Fleet also knew, however, that the Neuschatz group did not qualify for the RIHMFC mortgages. Concerning the residency requirement, Fleet knew that the majority of the Neuschatz group did not reside in the State of Rhode Island, but in New York: the addresses of the mortgagors were stated on the mortgage applications submitted to Fleet.[29] Concerning the primary residence requirement, Fleet was aware that the Neuschatz group consisted of investors who intended to purchase all of the properties in Shannock Village by and through a corporation or association and who did not intend to

**25.** Deposition of George H. Martin at 173–74, 186–88, 191–92, 215, 225–26, 647–48; Deposition of Sanford Neuschatz on September 19, 1986, at 66–70; Deposition of Sanford Neuschatz on September 20, 1986, at 31–32; Deposition of Sanford Neuschatz on October 3, 1986, at 48–51; Deposition of Sanford Neuschatz on October 11, 1986, at 216–20.

**26.** Deposition of George H. Martin at 187.

**27.** Id. at 186–87.

**28.** See Exhibit N, RIHMFC "Mortgage Purchase Program," December, 1980, at iii, iv, in plaintiff's submission of November 9, 1987.

**29.** Deposition of Sanford Neuschatz on September 19, 1986, at 104–07, 112–13, 117, 133–34; Deposition of Sanford Neuschatz on September 20, 1986, at 35–36.

utilize the properties as individual primary residences.[30]

Fleet was also aware that eligible mortgagors were required to be of low to moderate income levels.[31] Under the 1980 Series 1 Residential Acquisition Program, persons or families of low or moderate income "shall mean persons and families whose adjusted gross aggregate family income as reported for federal income tax purposes for the immediately preceding year shall not have exceeded $27,500 in the case of a single person or a family of two or $29,000 in the case of a family of three or more members".[32] Yet Fleet was also aware that the Neuschatz group consisted mainly of New York professionals, investors purchasing property for investment purposes.[33]

Fleet also had to certify that "[a]ll loans made by the Qualified Mortgages are in all respects a prudent investment for our own accounts."[34] Yet Fleet was informed by its own employees that dividing Shannock Village into individual lots with shared cesspools and water systems was ill-advised and that it would be more prudent to sell Shannock Village as a complete unit.[35] Moreover, when the Shannock Village sales were finally reviewed by specialists at RIHMFC, it was determined that these properties were not acceptable for RIHMFC financing. Justifying this decision, a RIHMFC foreclosure specialist wrote

Our reasons for this decision are numerous. The fact that the properties have decreased in value over a four (4) year period, have shared cesspools, shared lots, shared water systems (and no documentation as to who will be responsible for payment of any needed repairs on these shared items), are just to mention a few.[36]

Even if the decline in value over the four year period is ignored, the problem of the shared cesspools, lots and water systems were not only known to Fleet but were created by Fleet through its division of the town into individual lots prior to its certification of the investment as prudent. Finally, Fleet was informed by Mr. Martin who protested the division of Shannock Village that such a division would be imprudent and would affect the value of the Shannock Village properties adversely.[37]

As a result of the various dealings described above, a number of closings were achieved throughout the spring and summer of 1981. Precisely what occurred subsequent to these closings is unimportant to the present action. Nonetheless, the legal actions that preceded this one warrant mention. In February 1986, Fleet filed suit in the Superior Court of Rhode Island against Sanford Neuschatz and George Martin, seeking to recover for damages caused through fraud relating to the failure to make downpayments which would have gone to reduce Martin Industries' obligation to Fleet.[38] In March 1986, Sanford

**30.** Deposition of Sanford Neuschatz on September 19, 1986, at 86; Exhibit G, Credit Memorandum of Robert Daigle prepared on September 26, 1980, in plaintiff's submission of November 9, 1987; Exhibit I, Interoffice Letter prepared by Robert Daigle on December 22, 1980, in plaintiff's submission of November 9, 1987; Exhibit K, Interoffice Letter prepared by Robert Daigle on January 19, 1981, in plaintiff's submission of November 9, 1987.

**31.** Exhibit E, Seller's Certificate, in defendant's submission of November 16, 1987.

**32.** Exhibit B, Residential Acquisition Program, 1980 Series 1, Mortgage Purchase Agreement, at 4, in defendant's submission of November 16, 1987; see also Exhibit N, RIHMFC Mortgage Purchase Program, at v, in plaintiff's submission of November 9, 1987.

**33.** See supra note 30.

**34.** Exhibit E, Seller's Certificate, in defendant's submission of November 16, 1987.

**35.** Exhibit B, Report of Former U.S. Attorney General Griffen Bell, at 29–32, in plaintiff's submission of November 9, 1987; Deposition of George H. Martin at 562.

**36.** Exhibit P, RIHMFC Letter of September 26, 1985 to Fleet, in plaintiff's submission of November 9, 1987.

**37.** Deposition of George H. Martin at 113–14, 145, 562.

**38.** *Fleet Nation Bank v. Sanford Neuschatz and George Martin*, C.A. No. 86–0801 (Sup.Ct.R.I.).

Neuschatz filed a counterclaim in this state action and he and his wife Monica Schaffer filed a parallel complaint against, *inter alia*, Fleet for claims related to those filed by Fleet.[39] The following month, on April 11, 1986, the State of Rhode Island indicted, *inter alia*, Fleet and Robert Daigle on charges related to the subject matter of these two civil cases.

Soon thereafter, George Martin, *et. al.*, filed the present action against Fleet. The Complaint in the present action alleges three counts of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. sec. 1961 *et seq.* (1970) (hereinafter RICO), two counts of R.I.G.L. 1956 (1985 Reenactment) sec. 7–15–1 *et seq.* (Rhode Island's little RICO statute), one count of common law fraud and one count of emotional distress. This court has jurisdiction due to the federal claim under 28 U.S.C. sec. 1331 with the state claims being pendent, see *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

*RICO and The Statute of Limitations*

■ Defendant argues that plaintiffs' federal RICO action is barred by the applicable statute of limitations. Plaintiffs controvert this claim. Accordingly, this court must determine which statute of limitations is applicable under RICO.

RICO does not contain a provision limiting the period of time during which an action may be commenced under it. Generally, when a federal statute does not define its own period of limitation, a federal court must determine this period by applying the statute of limitations of the most analogous state cause of action. RICO is no exception to this general rule. *Kirschner v. Cable/Tel Corp.*, 576 F.Supp. 234, 241 (E.D.Pa.1983).

Plaintiffs contend that RICO should be limited to sec. 9–1–13(a) which states that "[e]xcept as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after." R.I.G.L. 1956

(1985 Reenactment) sec. 9–1–13(a). Defendant argues in contrast that sec. 9–1–14(b), which specially provides a limitation on actions for "injuries to the person," should control. This court has previously decided this question with respect to commercial fraud.

In *Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85 (D.R.I.1968), this court held that sec. 9–1–13(a) limits the period in which a commercial fraud action may be commenced in this district. Defendant argues, however, that *Rusch Factors* is not controlling due to recent caselaw from the Rhode Island Supreme Court. To assess the merits of this claim, this court will reconsider the holding of *Rusch Factors* in light of the subsequent pronouncements by the Supreme Court of Rhode Island.

Prior to 1902, the form of action by which one entered a Rhode Island court determined the statute of limitations that governed a claim. Actions in trespass *vie et armis* were barred if not commenced within four (4) years from the time of injury, while actions in trespass on the case were barred if not commenced within a period of six (6) years. R.I.G.L. 1896, ch. 234, secs. 2–3. In 1902, however, the legislature began to depart from the arid formalism of the nineteenth century and to focus instead on the nature of the injury suffered—providing, in particular, that "injuries to the person" were barred if not commenced within a period of two (2) years. P.L.1902, ch. 976, secs. 1–2. Three years later, in the Court and Practice Act, the legislature reaffirmed this departure from the forms of action. Court and Practice Act, sec. 248 (1905). The provision of this Act limiting actions for "injuries to the person" is carried into the present with only one difference by sec. 9–1–14(b) of the Rhode Island General Laws. R.I.G.L. 1956 (1985 Reenactment) sec. 9–1–14(b). The single difference is the current limitation: three (3) years instead of two (2). Id. It provides that "[a]ctions for injuries to the person shall be commenced and sued within

---

**39.** *Sanford Neuschatz and Monica Schaffer v. Fleet National Bank, Rhode Island Housing and Mortgage Finance Corporation, Ralph Pari, Rob-* *ert Daigle and Donald F. Armstrong, Jr.,* C.A. No. 86–11–41 (Sup.Ct.R.I.).

three (3) years next after the cause of action shall accrue, and not after." Id.

The phrase "injuries to the person" was originally interpreted by the Rhode Island Supreme Court in *Commerce Oil Refining Corp. v. Miner*, 98 R.I. 14, 199 A.2d 606 (1964). Therein, the court held that this phrase is meant to "include within that period of limitation actions brought for injuries resulting from invasions of rights that inhere in man as a rational being, that is, rights to which one is entitled by reason of being a person in the eyes of the law." *Id.* 199 A.2d at 610. Distinguished from such rights are "those which accrue to an individual by reason of some peculiar status or by virtue on an interest created by contract or property." *Id.*

In *Rusch Factors*, this court noted that commercial fraud is "certainly not an invasion of the plaintiff's rational integrity." *Rusch Factors*, 284 F.Supp. at 88. Rather, "it is nothing more or less than an invasion of the plaintiff's pocketbook." *Id.* As a result, this court determined that pecuniary loss resulting from reliance upon fraudulent or negligent misrepresentation is not an injury to the person within the meaning of sec. 9–1–14 of the Rhode Island General Laws. *Id.*

Defendant argues that the holding of *Rusch Factors* is no longer sound. Defendant claims that the Rhode Island Supreme Court in *Church v. McBurney*, 513 A.2d 22 (1986), recently extended "the application of the personal injury limitation to breach of statutory duty and/or injury with constitutional implications." Defendant's Reply Memorandum In Support Of Defendant's Motion For Judgment On The Pleadings at 6. Defendant, however, has misread the case.

In *Church*, a case in which a legal malpractice action was found not to be limited by sec. 9–1–14 because of the contractual nature of the attorney-client relationship, the Rhode Island Supreme Court distinguished *McDonald v. Rhode Island General Council*, 505 A.2d 1176 (1986), a case in which an action against a municipal union for breach of its fiduciary duty of fair representation to a union member was found limited by sec. 9–1–14. The court observed that in deciding *McDonald*, it had followed the reasoning of the United States Supreme Court in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In *Steele*, the Supreme Court found that a labor organization which provides exclusive employee representation "is clothed with power not unlike that of a legislature which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights." *Steele*, 323 U.S. at 198, 65 S.Ct. at 230. As a result, the Court held that when a statute, the Railway Labor Act in the *Steele* case, grants a form of legislative power to a labor organization, that statute also imposes on that organization a commensurate constitutional duty.

In *Church*, the court explained *McDonald* as following *Steele*. Therein, the court noted that "a municipal union's duty to its members is statutory in origin, deriving from its statutory position as the 'sole and exclusive negotiating or bargaining agent for all of the municipal employees in such appropriate bargaining unit' under G.L.1956 (1979 Reenactment) sec. 28–9.4–1, by virtue of which 'a public employee is precluded from pursuing a grievance on his own behalf.'" *Church*, 513 A.2d at 25. Accordingly, the court found in *McDonald*, as did the Supreme Court in *Steele*, a statutory duty with constitutional implications. Moreover, recalling that the issue before the court in *McDonald* was the application *vel non* of sec. 9–1–14(b), the court recognized that the definition of "a person in the eyes of the law" included the attribution of constitutional rights to the individual. From this minor premise together with the reasoning of *Steele*, the Rhode Island Supreme Court drew the conclusion that "the right of a municipal union member to fair representation by his or her exclusive bargaining agent bears a sufficient relationship to his or her rights as 'a person in the eyes of the law' so that a breach of that right qualifies as an 'injury to the person'." *Church*, 513 A.2d at 25. From this conclu-

sion, the holding of *McDonald* follows immediately: sec. 9–1–14(b) applies.

While sec. 9–1–14(b) may apply to situations analogous to the situation in *McDonald*, sec. 9–1–14(b) does not apply to the case at bar. In the present action there is no statutory right accompanied by a duty with constitutional implications. The rights that exist in the present action exist "by virtue of an interest created by contract or property." *Commerce Oil*, 199 A.2d at 610. Accordingly, the holding of *Rusch Factors* remains sound: pecuniary loss resulting from reliance on fraudulent or negligent misrepresentation is not "an injury to the person" under sec. 9–1–14(b). Moreover, such an action for pecuniary loss is the state action most analogous to the federal RICO action for injury to one's business or property—commercial fraud being itself a predicate act under 18 U.S.C. sec. 1961. Thus, *Rusch Factors* controls and the appropriate statute of limitations for a RICO action in this district is R.I.G.L. 1956 (1985 Reenactment) sec. 9–1–13(a). Under this statute of limitations, the present action of the plaintiffs is timely.

### *The Injury Requirement of Section 1964(c)*

The availability of a civil action under the federal RICO statute is governed by 18 U.S.C. sec. 1964(c). This provision states that

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. sec. 1964(c). While plaintiffs are clearly "persons" within the meaning of this section through the application of 18 U.S.C. sec. 1961(3), to succeed plaintiffs must show that (1) they sustained injury in their business or property (2) by reason of (3) a violation of 18 U.S.C. sec. 1962. Plaintiffs fail even to meet this first condition.

Plaintiffs claim that they have been injured in both their person and property.

Each type of injury will be considered in turn.

■ Concerning plaintiffs' injury to their business and property, recall that plaintiffs were the owners of Shannock Village; that plaintiffs had mortgaged this property with Fleet; that plaintiffs had collateralized additional loans from Fleet with their residence in West Warwick, Rhode Island; and that plaintiffs had defaulted on both the mortgage and the loans. Recall further that subsequent to plaintiffs' default, Fleet arranged financing with RIHMFC to enable the sale of Shannock Village to a group of investors headed by Sanford Neuschatz. The gravamen of plaintiffs' complaint is that this financing was obtained through fraud; that they were extorted by Fleet through threat of financial ruination to participate in this fraud; and that they were injured by Fleet's actions taken in furtherance of this fraud.

In particular, plaintiffs assert three separate injuries: first, plaintiffs claim that they were forced to incur excessive interest charges due to the time involved in Fleet's execution of its fraudulent scheme to obtain financing from RIHMFC; second, plaintiffs claim that they were forced to sell Shannock Village to the Neuschatz group at far less than its fair market value; and, third, plaintiffs claim that they were forced to forego any downpayments from the sale of Shannock Village to the Neuschatz group. While plaintiffs claim that their injuries resulted from Fleet's scheme to defraud RIHMFC, plaintiffs also claim that their "loss is separate and distinct and in no way derivative from any loss suffered by RIHMFC." Plaintiffs' Supplemental Memorandum in Opposition to Defendant's Motion for Judgment on the Pleadings and Motion to Dismiss at 8. Accordingly, this court need not enter any further into the details of Fleet's fraudulent scheme against RIHMFC in determining whether plaintiffs have sustained any business or property injuries legally cognizable under 18 U.S.C. sec. 1964(c).

On the facts presented, this court can find no legally cognizable injury. Plaintiffs do not claim that the interest incurred,

the loans made or the mortgage granted were in any way unlawful. Nor does plaintiff dispute that defendant had a legal right to the payment of interest, the repayment of the loans and the repayment of the mortgage. Plaintiffs merely claim that they were injured by Fleet coercing them into a contract for the sale of Shannock Village with the Neuschatz group.

For plaintiffs' injuries to be legally cognizable, these injuries would have to result from some form of unlawful conduct such as business compulsion, economic duress or extortion. But any such claim "cannot be predicated on a demand which is lawful or on the insistence of a legal right." *Chouinard v. Chouinard*, 568 F.2d 430 (5th Cir. 1978). There is no doubt that Fleet had a legal right to foreclose on plaintiffs' property and that, therefore, when Fleet threatened to exercise this right, defendant's conduct was lawful.

While this court does not hesitate to observe that plaintiffs have indeed suffered injury to their business and property in the lay sense of that term, this court is compelled to judge that plaintiff suffered no injury in the legal sense. It is not the function of law to insure against those risks which permit the possibility of profit in the rough and tumble business world of the Hobbesian man.

■ Moreover, concerning plaintiffs' claims of personal psychic injuries and emotion distress, this court can only note that civil RICO does not provide a remedy for such harms. See *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir.1986); *Van Schaick v. Church of Scientology of California, Inc.*, 535 F.Supp. 1125, 1137 (D.Mass.1982); see also *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500, 105 S.Ct. 3292, 3303, 87 L.Ed.2d 361 (1985) (Marshall, J., dissenting); *Moore v. Eli Lilly & Co.*, 626 F.Supp. 365, 366 (D.Mass.1986); *Campbell v. A.H. Robins Co., Inc.*, 615 F.Supp. 496, 501 (W.D.Wis.1985). Civil RICO only provides a remedy for injury to business or property. See *Van Schaick*, 535 F.Supp. at 1137.

In conclusion, this court finds that plaintiffs have not stated an injury within the

ambit of 18 U.S.C. sec. 1964(c). Accordingly, judgment is given for the defendant on the federal RICO counts.

### *The State Claims*

■ For the same reasons stated in the preceding section, plaintiffs fail to state an injury necessary to invoke Rhode Island's little RICO statute, R.I.G.L. 1956 (1985 Reenactment) sec. 7-15-1 *et seq.* Like the federal statute, Rhode Island's civil RICO provision requires that a person be "injured in his business and property...." R.I.G.L. 1956 (1985 Reenactment) sec. 7-15-4(c). Accordingly, judgment on counts VI and VII must also be given for defendant.

■ Nor have plaintiffs succeeded in stating a legally cognizable injury with respect to their common law fraud claims. Thus, for the same reasons articulated above, judgment on counts IV and V must be given for defendant.

Plaintiffs' final claim for emotional distress provides a special difficulty. In their claim, plaintiffs have not stated any physical symptomatology accompanying their asserted psychic injury. The difficulty is that the Rhode Island Supreme Court has never decided the issue whether a plaintiff may recover for emotional distress in the absence of physical symptoms. This court recently certified this question to the Rhode Island Supreme Court in *Reilly v. United States*, 665 F.Supp. 976 (D.R.I. 1987); however, as of the time of this writing, the Rhode Island Supreme Court has not yet answered this question.

While requiring physical symptoms is clearly the majority rule, see *Plummer v. Abbott Laboratories*, 568 F.Supp. 920, 925–27 (D.R.I.1983), this court finds the reasoning behind the minority rule, as given, for example, in *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433 (Me.1982), more persuasive. Therein, Justice Violette concluded

> We now reject the notion that the plaintiff must allege or prove physical injuries or physical manifestations of the distress, [citation omitted], as well as emotional and mental trauma, in order to

prevail. We do so for three reasons. First, the requirement in its application is overinclusive since it permits recovery for demonstrably trivial mental distress claims accompanied by physical symptoms. Second, it is underinclusive since serious distress is arbitrarily deemed not compensable if not accompanied by physical symptoms. Third, such a rule "encourages extravagant pleading and distorted testimony." [citation omitted] Given the state of modern medical science, we can safely conclude that proof of "objective symptomatology" is no longer necessary, although it may be highly persuasive evidence, to establish mental distress.

*Culbert,* 444 A.2d at 437. Accordingly, this court does not decide this issue but reserves judgment on this count until such time as the Rhode Island Supreme Court answers the question certified to it in *Reilly.*

#### Order

Thus, this court finds for the defendant on all counts except the last on which it reserves judgment.

So Ordered.