LYONS, Justice.
Dana P. Haston and Tazewell Shepard, as trustee of the Chapter 7 bankruptcy estate of Dana Haston, appeal from a summary judgment in favor of Timothy B. Crowson; Crowson Partners, P.C.; and Madison County Record, Inc. (all hereinafter together referred to as “the defendants”), in Haston’s action against them. We affirm.

Factual Background and the Proceedings Below

The following facts are drawn from Ha-ston’s affidavit in opposition to the defendants’ motion for a summary judgment and from her answers to interrogatories.
Haston’s husband, Richard Haston, owned the Madison County Record, a newspaper published in Madison County. In 1989, he engaged the services of Crow-son, a lawyer, and his law firm to represent both the Hastons and the newspaper. In the ensuing years, Crowson represented the Hastons and became privy to confidential aspects of the newspaper as a business. On or about June 80, 1992, Haston and her husband filed for reorganization under Chapter 13 of the United States Bankruptcy Code. (The Chapter 13 proceeding was later converted to a Chapter 7 proceeding.) Crowson advised the Ha-stons to retain counsel experienced in bankruptcy law to file their bankruptcy petition; they did so. Crowson continued to serve as attorney for the newspaper.
In June 1994, Dana Haston was in the process of divorcing her husband. At some point during the divorce proceedings, she told Crowson that after the divorce she would be the sole owner of the newspaper. (It is undisputed that Crowson did not represent Haston or her husband in the divorce.) Crowson advised Haston that because of her financial situation, she needed investors for the newspaper, and he told her that he knew people who might be interested in investing in it. Crowson repeatedly contacted Haston about the importance of securing investors for the business, and he assured her that doing so was in the best interest of the newspaper.
In early October 1994, a potential purchaser, Albert Thompson, approached Ha-ston about buying the newspaper. She contacted Crowson and asked him to draft a nondisclosure agreement to be used during negotiations, and he agreed to do so. Crowson advised Haston not to make any decisions about this potential sale without first talking to him. Haston agreed that she would not make a decision without consulting him. Crowson further advised Haston about managing the documents she gave to Thompson in such a manner as to protect the confidentiality of the documents. Crowson discouraged Haston from entering into the sale transaction with Thompson and suggested that she consider *19 talking with the investors he had previously mentioned.[1]
During the next three months, Crowson telephoned Haston on several occasions, recommending that she talk with the investors he had previously mentioned to her. Crowson told Haston that he had prepared nondisclosure agreements for these investors to sign and that it would be all right for her to talk with them. When Haston asked for copies of the nondisclosure agreements signed by the proposed investors, Crowson told her he would keep them in his office. "When Haston asked Crowson if he had signed a nondisclosure agreement, he said that he did not have to sign such an agreement because he was her attorney and, therefore, everything he did in that capacity was protected by attorney-client privilege. On March 31, 1995, Haston met with potential investors Ted 0. Romine and Philimond S. Smith. Crowson was present at the meeting as her attorney. The' purpose of the meeting was to discuss Romine and Smith’s potential investment in the newspaper. As a result of negotiations that took place over the next few months, the investors offered to purchase 90% of the newspaper business; 10% would be placed in an irrevocable trust for Haston’s children and Haston would remain an employee of the newspaper for one year after the sale. The proposal also called for 25% of the newspaper’s accounts receivable at the time the transaction was completed to be deposited directly to Haston’s bankruptcy estate and 10% of the accounts receivable to be paid directly to Haston. Everyone understood that the purchase and its terms had to be approved by the United States Bankruptcy Court.
Around May 4, 1995, Haston received a letter from Crowson; that letter summarized some of the meetings and telephone conversations and referred to Romine and Smith as “my clients.” Crowson later explained to Haston that his reference to them as clients was merely a formality and that he was preparing the paperwork for them to compléte the purchase because he was Haston’s lawyer. Based upon Crow-son’s representation that in fact he was acting as Haston’s lawyer, upon his representation that “this was a good deal for [her],” and upon the representation that Romine and Smith were the purchasers of the 90% share of the newspaper business, Haston signed the documents evidencing the sale of the newspaper on June 20, 1995. Later that same day, upon reviewing the documents, she discovered that Crowson was one of the owners of Madison County Record, Inc., the newly formed corporation that had purchased 90% of the newspaper business. Haston stated in her affidavit:
“I then realized that his previous statements to me that he was representing me and my best interest in the transaction were false and that his representation of the new company as a mere formality without conflict to me was also false. I did not have a choice at this point. I was economically desperate. The paper was falling apart. I should have sold months earlier. The damage due to the delay had already occurred. I had no choice but to go through with *20 the deal including court approval at this point....
[[Image here]]
“I had discussed selling the newspaper with Mr. Tim Crowson and he knew my financial weakness, and what my bottom line was.
[[Image here]]
“... My business was worth about $350,000 in October of 1994, ... but if I could just get the debts paid and a little for myself I would be happy. I was relying on the advice of my attorney Tim Crowson, by waiting to sell the company for at least eight months. As a result of the delay I ended up selling it for far less than the fair market value of the business.”
Crowson had repeatedly told Haston that if she discussed anything pertaining to the sale of the newspaper or the asset acquisition agreement with anyone, Smith and Romine could take legal action against her. She says that she was not aware that she had the option of halting the sale, even after she had signed the documents. She also says that because the business was slowly “going under,” she thought that going forward with the sale was the only way to salvage what was left, because she had been told that as soon as she signed the documents, Romine and Smith would put capital into the business.
Haston was terminated as an employee of the newspaper in February 1996. She filed this action on June 9, 1997. By then her Chapter 13 proceeding had been converted to a Chapter 7 proceeding, and on June 16, 1997, Haston amended her complaint in this action to add the bankruptcy trustee as a plaintiff. The trial court, by subsequent order, characterized the trustee as “the primary party plaintiff.” The defendants answered the complaint, denying the allegations and asserting as affirmative defenses that the action was barred by the doctrines of waiver and estoppel. The defendants then moved for a summary judgment. The trial court entered a summary judgment for the defendants; Ha-ston and the trustee appealed.
Haston contends that the trial court erred in entering the summary judgment because, she says, there was substantial evidence indicating that Crowson, while acting as her attorney, discouraged her from selling to anyone other than the corporation in which he had an interest and encouraged her to sell to that corporation at a low price. She also contends that she had no choice but to go forward with the proposed sale because she was in economic distress. The defendants contend that there was no attorney-client relationship between Crowson and Haston at the time of the sale and that, in all events, Haston’s conduct — securing approval of the sale in the bankruptcy court after becoming aware of Crowson’s relationship with the new corporation — constitutes the cause of any loss or otherwise estops her from recovering any damages.
We pretermit discussion of whether an attorney-client relationship existed between Haston and Crowson at the time of the sale transaction, because, even if it did, the summary judgment was proper.

Standard of Review

The standard by which this Court will review a motion for a summary judgment is well established:
“ ‘The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, *21 the burden shifts to the nonmovant to present “substantial evidence” creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); § 12-221-12(d)[,] Ala.Code 1975. Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
“ ‘In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala.1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).’ ”
Payton v. Monsanto Co., 801 So.2d 829, 832-33 (Ala.2001) (quoting Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala.1999)).

Causation, Waiver, and Estoppel

The defendants point to the affirmative steps Haston took to secure approval of the transaction by the bankruptcy court after she became aware of Crowson’s ownership interest in the corporation as evidence that she had waived any claims she might have had, or that she was estopped from raising any claims, or that her voluntary act of securing the approval of the bankruptcy court was the cause of her alleged loss. They argue that not only did she authorize her bankruptcy attorney to proceed in her name to have the sale of the newspaper approved immediately after the closing of the sale, she also authorized subsequent proceedings taken to resist an effort to block the sale by an individual claiming to have been an owner of the newspaper who alleged that she had not received notice of the sale.
The defendants rely on Kuhlman v. Keith, 409 So.2d 804 (Ala.1982), in which the plaintiff lost custody of her children as a result of signing a consent agreement drafted by S.P. Keith, her ex-husband’s father and a lawyer. She alleged fraud and negligence by Keith. The Court held that she had failed to show that she had signed the agreement in reliance upon a statement or an act of Keith or his agent. Furthermore, the plaintiff in Kuhlman failed to prove that she had suffered any damage, because the evidence showed that she had given up her children voluntarily, and, therefore, she could not recover on her claims. This Court in Kuhlman stated:
“In her deposition, appellant states that she fully understood the agreement and all of the documents she signed. She also states that Tant [Keith’s assistant] made no effort to influence her decision either through threats or suggestions ....
[[Image here]]
“As we have pointed out previously, the facts show that the appellant knowingly and voluntarily gave up custody of her children in the original divorce agreement and later chose not to contest the same when she asked that the petition to challenge the judgment be dismissed. We find that it was the appellant’s actions, not S.P. Keith’s, that were the proximate cause of her loss of the custody of the children.”
409 So.2d at 808-09.
The defendants analogize the plaintiffs independent act of signing the custody agreement in Kuhlman to Haston’s securing approval of the sale in the bankruptcy court. However, in response Haston cites Ralls v. First Federal Savings & Loan
*22 Association of Andalusia, 422 So.2d 764 (Ala.1982). In that case, the savings and loan allegedly committed to a loan at an interest rate of 10%, but when the time came to close the loan, the savings and loan insisted upon a rate of 12%, to which the debtor agreed. The debtor then sued the savings and loan, alleging fraud, breach of contract, and deceit. The savings and loan offered the executed loan documents as proof of an accord and satisfaction. The debtor met this defense by contending that economic duress prevented the savings and loan from asserting the defense of accord and satisfaction. This Court agreed, holding:
“ ‘While the doctrine of economic duress or business compulsion is constantly being expanded by the courts, it may be invoked only to prevent an injustice and not to accomplish an injustice. The doctrine applies only to special, unusual, or extraordinary situations in which unjustified coercion is used to induce a contract, as where extortive measures are employed, or improper or unjustified demands are made, under such circumstances that the victim has little choice but to accede thereto.’ ”
422 So.2d at 766 (quoting 17 C.J.S. Contracts § 177 (1963)).
Haston contends that because this Court recognized in Ralls that economic duress can overcome a defense of accord and satisfaction, it logically follows that evidence of economic duress can also defeat a contention that a voluntary act is the cause of her alleged loss or that such an act results in a waiver or an estoppel.
The ■ trial court disposed of this argument as follows:
“Mr. Sabatini [the attorney who represented Haston in the bankruptcy proceedings] in his deposition indicated that he received a copy of the Asset Acquisition Agreement prior to the completion of the sale. He said he believes he reviewed ■ this document with his client, Dana Haston, before the sale was approved by the bankruptcy court. He also received an executed copy of this agreement sometime after June 20, 1996. Mr. Sabatini, at the direction of his client, filed a Motion for Authority to Sell Property and Notice of Sale with the bankruptcy court on June 23, 1995 to get the sale approved by the Court. The sale was approved by the Court after a hearing held on July 25, 1995. Further, Mr. Sabatini, with his chent’s approval, filed documents to contest an attempt to set aside the sale filed by a Kimberly Reeves. Mr. Sabatini was successful and Ms. Reeves’ Motion for Relief was denied.
“As the above synopsis of the facts show plaintiff Haston could have stopped the sale before June 20 when Mr. Sabatini received and reviewed a copy of the Asset Acquisition Agreement, or after the sale was approved by the bankruptcy court or when the contest was filed by Ms. Reeves. She allowed the sale to be completed despite the fraud she discovered on or about June 20, 1995. As stated before, Ms. Haston had several opportunities to short circuit the sale of the Record but she allowed the sale to proceed after being allegedly defrauded by the defendant Crowson.”
The Court discussed the doctrine of economic duress in International Paper Co. v. Whilden, 469 So.2d 560 (Ala.1985). In that case, this Court held:
“Tantamount to a claim of economic duress is the wrongful pressure exerted by one party which overcomes the will of another.
“ ‘It is said that economic duress must be based on conduct of the opposite party and not merely on the ne *23 cessities of the purported victim. The entering into a contract with reluctance or even dissatisfaction with its terms because of economic necessity does not, of itself, constitute economic duress invalidating the contract. Unless unlawful or unconscionable pressure is applied by the other party to induce the entering into a contract, there is not economic compulsion amounting to duress. Chouinard v. Chouinard, 568 F.2d 430 (5th Cir. 1978).’ ”
469 So.2d at 563 (quoting Board of School Comm’rs of Mobile County v. Wright, 443 So.2d 35, 38-39 (Ala.Civ.App.), rev’d on other grounds, 443 So.2d 40 (Ala.1983) (emphasis added)).
The focal point of the inquiry concerning Easton’s claim of economic duress is her conduct after she had knowledge of Crow-son’s role in the corporation that was purchasing the newspaper — not the circumstances surrounding the execution of the asset acquisition agreement. The evidence Haston presented concerning economic duress as it relates to her activities in securing court approval of the sale describe only her exigent financial circumstances. While she states that Crowson had urged her not to discuss the sale of the newspaper with any third party, there is no evidence that this admonition was made after the sale. Nor is there any explanation for why she did not confront Crowson immediately after learning of his participation in the corporation and demand the damages she now claims in this proceeding as a condition to securing approval of the sale in the bankruptcy court. The agreement not to discuss the transaction would certainly not have applied to Crowson, who at the time, according to Haston, was her attorney. In fact, in her affidavit Haston states, “Mr. Crowson told me not to discuss the details with anyone else and I did not.” (Emphasis added.) Evidence of threats, or of unlawful or unconscionable pressure on Crowson’s part after he was confronted with allegations of his breach of his obligations as an attorney, but before Haston took steps to obtain approval by the bankruptcy, court, would present an entirely different case.

Conclusion

We therefore agree with the trial court’s ultimate conclusion that Haston had several opportunities to “short circuit the sale” of the newspaper, but that she allowed the sale to proceed after she had undisputed knowledge of the alleged fraud. The summary judgment is due to be affirmed.
AFFIRMED.
MOORE, C.J., and HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., concurs specially.

. We note that in her deposition, Haston testified that Thompson contacted her about the possibility of buying the newspaper and that on October 6, 1994, they had a meeting to discuss the possible sale. Approximately two weeks later, however, Thompson sent Haston a letter; that letter stated: "Wish things could have worked out. I think you have a good market, needs tons of attention.” There is no evidence indicating a discussion of any potential sales price for the newspaper or indicating that Thompson or anyone else ever made Haston an offer to buy the newspaper.